**MOBIL OIL CORPORATION, Atlantic Richfield Company, United Refining Company, Inc. and Gulf Oil Company, Plaintiffs,**

v.

**James H. TULLY, Jr., Thomas H. Lynch, and Francis Koenig, Constituting the New York State Tax Commission; Robert Abrams, Attorney General of the State of New York; and James L. LaRocca, Commissioner of the New York State Energy Office, Defendants.**

**NEW ENGLAND PETROLEUM CORPORATION, Plaintiff,**

v.

**James H. TULLY, Jr., Commissioner of Taxation and Finance of the State of New York, and Robert Abrams, Attorney General, State of New York, Defendants.**

**AMERADA HESS CORPORATION, Plaintiff,**

v.

**James H. TULLY, Jr., Thomas H. Lynch, and Francis Koenig, Constituting the New York State Tax Commission; Robert Abrams, Attorney General of the State of New York; and James L. LaRocca, Commissioner of the New York State Energy Office, Defendants.**

**Nos. 80–CV–543, 80–CV–544, 80–CV–570.**

United States District Court,
N. D. New York.

Sept. 19, 1980.

Donovan, Leisure, Newton & Irvine, New York City, Bond, Schoeneck & King, Syracuse, N. Y., for plaintiffs Mobil Oil Corp., Atlantic Richfield and United Refining Co.; Thomas R. Trowbridge, III, New York City, John M. Freyer, Syracuse, N. Y., of counsel.

Edward F. Gerber, Syracuse, N. Y., Arthur L. Vangeli and Sydney M. Avent, Philadelphia, Pa., for Gulf Oil Corp.

Cleary, Gottlieb, Steen & Hamilton, New York City, Bouck, Holloway & Kiernan, Albany, N. Y., for plaintiff New England Petroleum; James C. Blair, New York City, Warner Bouck, Albany, N. Y., of counsel.

Kaye, Scholer, Fierman, Hays & Handler, New York City, Hancock, Estabrook, Ryan, Shove & Hust, Syracuse, N. Y., for plaintiff Amerada Hess Corp.; Stanley D. Robinson, New York City, William L. Allen, Jr., Syracuse, N. Y., of counsel.

Robert Abrams, Atty. Gen., State of New York, Albany, N. Y., pro se and for defendant LaRocca; Shirley Siegel, Sol. Gen., Albany, N. Y., of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendants Tully, Lynch and Koenig, constituting the New York State Tax Commission; Edward Costikyan, Simon H. Rifkind, New York City, of counsel.

## ORDER

McCURN, District Judge.

Defendants have moved for an order dismissing these three actions for lack of subject matter jurisdiction pursuant to 28 U.S.C. § 1341. Plaintiffs in each action have moved for an order granting summary judgment in their favor. The Court has concluded after full hearing and after consideration of the arguments of counsel on both motions, the memoranda submitted therewith, both in support and opposition, and the exhibits attached thereto, that the defendants' motion to dismiss should be denied and that plaintiffs' motions for summary judgment should be granted and has further concluded that in the interests of

judicial economy and in fairness to the litigants, this Order should be issued forthwith with a Memorandum–Decision containing the Court's findings of fact and conclusions of law to follow, as to avoid the need for the hearing scheduled for September 10, 1980, on plaintiff New England Petroleum Corporation's application for a preliminary injunction with a consolidated hearing on the merits. It is therefore

ORDERED, ADJUDGED AND DECREED that:

1. The defendants' motion to dismiss the plaintiffs' complaints in these three actions is denied;

2. The plaintiffs' motions for summary judgment (a) declaring the anti–pass through provision of section 182(12)(a) of the New York Tax Law as added by L.1980 ch. 271, § 4, as amended by ch. 272, § 1, and ch. 272, § 2, invalid as pre–empted by the Emergency Petroleum Allocation Act, 15 U.S.C. §§ 751–760h and the Mandatory Petroleum Price Regulations, 10 C.F.R. Part 212, promulgated thereunder and thus void under the Supremacy Clause of the United States Constitution and (b) enjoining defendants, their delegates and successors in office from enforcing the anti–pass through provision against plaintiffs in these actions, are granted;

3. Entry of judgment in these actions is hereby stayed until September 17, 1980, and in the event that a Memorandum–Decision has not been issued by the Court by that time, the Court shall, upon notice to the parties, extend the stay until such time as a decision is issued and the defendants have had a reasonable time to seek a further stay from the United States Court of Appeals for the Second Circuit.

IT IS SO ORDERED.

### MEMORANDUM AND DECISION

Plaintiffs in these actions seek (a) a declaration that section 182(12) of the New York Tax Law, as added by L.1980, ch. 271 § 4 and ch. 272 § 2, which prohibits the pass–through of the State's recently enacted two (2%) percent gross receipts tax on certain oil companies is unconstitutional and thus invalid and (b) a permanent injunction enjoining the defendants from enforcing the anti–pass through provision. Relief is sought on the grounds that the anti–pass through provision (1) establishes a state price control rule which conflicts with the Federal Emergency Petroleum Allocation Act of 1973, §§ 1–19, 15 U.S.C. § 751–760h as amended, (EPAA), and the Federal Mandatory Petroleum Price Regulations, 10 C.F.R. Part 212 (Price Regulations) promulgated thereunder, and is thus void under the Supremacy Clause of the United States Constitution (U.S.Const. Art. VI, cl. 2); (2) impermissibly burdens interstate commerce and thus is void under the Commerce Clause of the United States Constitution (U.S.Const. Art. I, § 8, cl. 3); and (3) contravenes the Due Process Clause of the Fourteenth Amendment to the United States Constitution. (U.S.Const. Amend. XIV, § 1).

Plaintiffs in all three actions assert jurisdiction under 28 U.S.C. §§ 1331 and 1337. In addition, plaintiffs in the Mobil Oil and Amerada Hess actions claim that exclusive original jurisdiction is vested in this Court by § 211 of the Economic Stabilization Act of 1970 (12 U.S.C. § 1904 note), as expressly incorporated by reference in § 5(a) of the EPAA (15 U.S.C. § 754(a)], and section 502(b) of the Department of Energy Organization Act, 42 U.S.C. § 7192(b).[1]

The three actions are presently before the Court on the defendants' motion to dismiss pursuant to the Tax Injunction Act, 28 U.S.C. § 1341 and the plaintiffs' motions for summary judgment under Rule 56 of the Fed.R.Civ.P. on their respective pre–emption claims.[2]

---

1. Plaintiffs in the Mobil Oil action also include section 210(a) of the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note in their exclusive jurisdiction claim.

2. A pretrial conference with regard to all three actions was held by the Court on July 29, 1980, for the purpose of establishing an accelerated litigation schedule. At that conference it was decided that defendants' motion to dismiss

## THE NEW YORK LEGISLATION

On June 18, 1980, the Governor of New York State signed into law two bills which impose an annual tax "upon every oil company equal to two per centum of its gross receipts from all sources, or the portion thereof allocated within the State as hereinafter provided . . . ." (L.1980, ch. 271, § 4).[3] The tax is imposed on each company "for the privilege of exercising its corporate franchise, or of doing business, or of employing capital, or of owning or leasing property in this state in a corporate or organized capacity or of maintaining an office in this state, for all or any part of its taxable years." *Id.* Pursuant to the statute the term gross receipts covers all receipts with the exception of "[r]eceipts received by reason of any sale of fuel oil (excluding diesel motor fuel) used for residential purposes" and "receipts from any sale for resale to a purchaser which is an oil company subject to tax under this section." *Id.*

Revenue collected through the imposition of this new tax is earmarked to go into the "regional transportation operating and capital assistance fund", created by the legislation (L.1980, ch. 271 §§ 2, 11), and is to be used to provide operating and capital assistance to New York State's mass transportation system.

An additional provision of the State's new revenue raising plan prohibits the pass–through of the tax in the prices charged to consumers for products sold by the oil companies in New York State. The anti–pass through provision, which is set forth in subsection 12(a) of the new section 182 of the New York Tax Law, provides that:

> The tax imposed by this section and any penalty which may be assessed under this subdivision shall be a liability of the oil company, shall be paid by such company and shall not be included, directly or indirectly, in the sales price of its products sold in this state.

L.1980, ch. 271, § 4(12)(a).

Under the new law, each oil company subject to the tax is required to file an annual report with the Commission of Taxation and Finance "certifying, under oath, that it has not included, directly or indirectly, in the sales price of its products sold in this state the tax imposed by this section." L.1980, ch. 271, § 4. Companies which are found to have passed on the cost of the new tax through increased product costs or who are found to have filed false reports in violation of the certification requirement are subject to a penalty equal to one hundred (100%) percent of the tax imposed for the year in which the violation occurs. L.1980, ch. 271, § 4(12)(b)(2).

The plaintiffs in these actions are oil companies within the meaning of the legislation involved in this litigation and are, therefore, subject to the gross receipts tax. Each, in the normal course of business, would generally pass on the cost of the new tax through increased petroleum product prices to customers in the taxing jurisdiction.

None of the plaintiffs challenges the imposition of the gross receipts tax itself. Rather, they challenge only the anti–pass through provision of § 182(12)(a), which is now in effect. As previously indicated, the plaintiffs' motions for summary judgment which are before the Court are limited to the pre–emption claims.

Analysis of the pre–emption claims shall necessitate a careful examination of the Federal EPAA and the Mandatory Price Regulations promulgated thereunder.

---

would be argued on August 20, 1980. It was further determined that motions for summary judgment to be brought by the plaintiffs would be heard on August 27, 1980, and would be limited to the parties' pre–emption claims, without prejudice to plaintiffs' seeking summary judgment on their Commerce and Due Process claims at a later date.

Plaintiff, New England Petroleum Corporation's motion for a preliminary injunction with a consolidated hearing on the merits pursuant to Rule 65 of the Fed.R.Civ.P. was scheduled to commence September 10, 1980.

3.  The full text of Senate Bills 10188 and 10261 is set forth in an Appendix to this Memorandum–Decision.

However, since the need for a determination on the preemption issue would disappear should the Court grant the defendants' motion to dismiss, that motion should be addressed and disposed of first.

## MOTION TO DISMISS

Defendants contend that the Tax Injunction Act, 28 U.S.C. § 1341, divests the Court of jurisdiction in these actions. Plaintiffs disagree. Section 1341 provides that:

> The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.

The defendants' argument for application of the Tax Injunction Act in these cases is basically as follows. Plaintiffs are challenging the validity of the anti–pass through provision of the new oil company franchise tax legislation. If plaintiffs are successful in having the anti–pass through invalidated, the gross receipts tax, by the terms of the New York legislation "shall cease to be in force and effect." L.1980, ch. 271, § 12, as amended by L.1980, ch. 272, § 5. Thus, according to the defendants, the plaintiffs' attack on the anti–pass through provision is in reality an attack on the tax itself. Since a decision by this Court striking down the anti–pass through provision would by virtue of the statutory mandate, effectively "enjoin, suspend or restrain the assessment, levy or collection of [a] tax under State law," defendants conclude that the Court is without jurisdiction pursuant to 28 U.S.C. § 1341.

**4.** The legislative history of the Tax Injunction Act suggests two purposes behind its passage. The first was to eliminate the discrimination between citizens of a state who were confined to state court in challenging illegal tax assessments and foreign corporations who were able to take advantage of diversity jurisdiction in federal court.

Second, Congress wished to prevent foreign corporations from paralyzing state fiscal operations by refusing to pay state taxes and then commencing long and expensive litigation in federal court. S.Rep.No. 1035, 75th Cong., 1st Sess. (1937); 81 Cong.Rec. 1415–17 (1937).

Plaintiffs challenge the defendants' conclusion as to the applicability of 28 U.S.C. § 1341 in these actions and disagree as well with defendants' assertion of the availability to plaintiffs of a "plain, speedy and efficient remedy" in the Courts of New York State. In disputing the existence of a State Court remedy acceptable under 28 U.S.C. § 1341, plaintiffs argue that exclusive jurisdiction over their pre–emption claim rests in federal district court by virtue of § 211 of the Economic Stabilization Act of 1970 (12 U.S.C. § 1904 note), which as previously pointed out was expressly incorporated by reference in § 5(a) of the EPAA, 15 U.S.C. § 754(a). Thus, according to plaintiffs there is no state court remedy available.

Since, for reasons to be discussed below, the Court does not find the Tax Injunction Act, 28 U.S.C. § 1341, applicable to these actions, it will not be necessary to reach plaintiffs' exclusive jurisdiction claim.

■ The Tax Injunction Act embodies long–standing principles of equity and federalism which recognize "the imperative need of a State to administer its own fiscal operations."[4] *Tully v. Griffin*, 429 U.S. 68, 73, 97 S.Ct. 219, 222, 50 L.Ed.2d 227 (1976). Quoting from the decision of the Supreme Court in *Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293, 298, 63 S.Ct. 1070, 1073, 87 L.Ed. 1407 (1943), the Court in *Tully* stressed that:

> "Interference with state internal economy and administration is inseparable from assaults in the federal courts on the validity of state taxation, and necessarily attends injunctions, interlocutory or final restraining collection of state taxes.

*See also Garrett v. Bamford*, 538 F.2d 63, 72 (3d Cir.), *cert. denied* 429 U.S. 977, 97 S.Ct. 485, 50 L.Ed.2d 585 (1976); *Tramel v. Schrader*, 505 F.2d 1310, 1315–16 (5th Cir. 1975).

The Supreme Court, however, has consistently described the Act's passage as a confirmation of the traditional equity practice of federal courts' refraining from exercising jurisdiction over actions challenging state taxes as long as an adequate state remedy was available. *See Tully v. Griffin, supra*, 429 U.S. at 73, 97 S.Ct. at 222; *Great Lakes Dredge & Dock Co. v. Huffman, supra*, 319 U.S. at 298, 63 S.Ct. at 1073.

*Tully v. Griffin, supra,* 429 U.S. at 73, 97 S.Ct. at 222. *See also Matthews v. Rodgers,* 284 U.S. 521, 525–526, 52 S.Ct. 217, 219, 76 L.Ed. 447 (1932).

■ Section 1341 has been found to apply equally to actions for declaratory or injunctive relief. *Houston v. Standard–Triumph Motor Co.,* 347 F.2d 194, 198 (5th Cir. 1965); *Helmsley v. City of Detroit,* 320 F.2d 476, 478 (6th Cir. 1963); *First United Methodist Church v. City of Syracuse,* 489 F.Supp. 185 (N.D.N.Y.1980).

The Tax Injunction Act has served as the basis for dismissal on jurisdictional grounds of actions directly challenging the validity of a state tax, *See e. g. American Commuters Ass'n. v. Levitt,* 279 F.Supp. 40 (S.D.N.Y.1967) *aff'd.* 405 F.2d 1148 (2d Cir. 1969); *57th St. Management Corp. v. City of New York,* 456 F.Supp. 286 (S.D.N.Y.1978); actions attacking particular aspects of state taxing schemes, which bore a direct relationship to the successful assessment and collection of the tax, *See e. g. Mandel v. Hutchinson,* 336 F.Supp. 772 (C.D.Cal.1971) *aff'd;* 494 F.2d 364 (9th Cir. 1974); and lawsuits challenging the procedures and methods employed in the levy or collection of a state tax. *See e. g. Czajkowski v. State of Ill.,* 460 F.Supp. 1265, 1271–74 (N.D.Ill.1977), *aff'd mem.,* 588 F.2d 839 (7th Cir. 1978); *Kimmey v. H. A. Berkheimer, Inc.,* 376 F.Supp. 49, 54–55 (E.D.Pa.1974), *aff'd. mem.,* 511 F.2d 1394 (3d Cir. 1975).

Section 1341 has, on occasion, been found inapplicable in cases involving an aspect of a state taxing scheme. In *Hargrave v. McKinney,* 413 F.2d 320 (5th Cir. 1969), the Court found that § 1341 did not require dismissal of an action in which the plaintiffs sought the collection and disbursement of certain county tax monies rather than an injunction on collection of taxes.

The Second Circuit in *Wells v. Malloy,* 510 F.2d 74 (2d Cir. 1975), refused to apply the Tax Injunction Act where the plaintiff challenged a Vermont statute which suspended the driver's licenses of individuals in default in payment of the state motor vehicle purchase and use tax. Writing for the Court, Judge Friendly stated that in enacting the Tax Injunction Act

Congress was thinking of cases where taxpayers were repeatedly using the federal courts to raise questions of state or federal law *going to the validity of the particular taxes imposed upon them* (footnote references omitted)-not to a case where a taxpayer contended that an unusual sanction for non–payment of a tax admittedly due violated his constitutional rights . . . . (Emphasis supplied)

*Id.* at 77.[5]

There is no question but that the gross receipts tax on oil companies would cease to be in effect at a statutorily ordained time after a determination by the Courts that the anti–pass through provision now under attack is invalid. Nonetheless, this Court as previously stated, does not believe that these cases fall within the jurisdictional proscription of the Tax Injunction Act.[6]

■ The plaintiffs are not challenging the validity of the gross receipts tax nor are they attacking the statutorily prescribed administrative procedure for assessing, levying or collecting the tax. In fact, but for the "self–destruct" mechanism included in the legislation, a determination by this Court invalidating the anti–pass through provision would have absolutely no affect on the "assessment, levy or collection" of the gross receipts tax. 28 U.S.C. § 1341.

---

5. The new Tax Injunction Act has also been found to be inapplicable in actions which are either brought by the United States or which although brought by a private individual or group could have been commenced by the United States. *See e. g. Moe v. Confederated Salish and Kootenai Tribes,* 425 U.S. 463, 473, 96 S.Ct. 1634, 1641, 48 L.Ed.2d 96 (1976); *Department of Employment v. United States,* 385 U.S. 355, 358, 87 S.Ct. 464, 466–67, 17 L.Ed.2d 414 (1966).

6. The Fifth Circuit Court of Appeals in *Hargrave v. McKinney, supra,* 413 F.2d at 326 cautioned that:

Encroachments on the federal judiciary's power to vindicate rights allegedly guaranteed by the Constitution must be construed narrowly. *Cf. Phillips v. United States,* 1941, 312 U.S. 246, 251, 61 S.Ct. 480, 85 L.Ed. 800.

■ Defendants describe the tax and the anti–pass through provision as a "single entity", with the latter provision being merely a "rule of tax incidence".[7] Plaintiffs, on the other hand, argue that the anti–pass through provision is a state price control measure separate from the tax itself. The Court, having carefully reviewed the statutory language of S–10188 and 10261 agrees that the anti–pass through provision is a price control measure, rather than a rule of tax incidence. *See Schirtzinger v. Dunlop,* 489 F.2d 1307, 1310 (Em. App.1973) (treating pass–through regulations as a form of price control), and is of the opinion that the "self–destruct" mechanism contained in the legislation indicates an intent on the part of the state legislature to impose the gross receipts tax on oil companies *only* if it can in addition impose controls on the prices charged by the companies for products sold in New York State. The statement of legislative findings and declaration of purpose, following discussion of the State's mass transit fiscal crisis, provides that:

It is also found that oil companies are currently reaping historically high profits. These increased profits do not result from the application of normal management techniques and strategies which any business uses to maximize profits, but *rather result from the market conditions prevailing within the international oil industry, which are artificially inflating the price of petroleum products.* In view of the high cost of petroleum, the importance of energy conservation and New York's dependence upon foreign energy suppliers, *oil companies have become businesses clothed with a public interest.* (Emphasis supplied)

L.1980, ch. 272, § 1.

The statement goes on to indicate an awareness on the part of the Legislature of the problems involved in supporting a mass transportation system in light of the "economic recession" and "inflationary cycle".

*Id.* The Legislature, having determined that it did not wish to contribute to the "inflationary spiral" or "contribute to further increases in the price of petroleum products to consumers" expressed the following legislative intent:

The legislature hereby determines and declares that it is the public policy of the state to tax the gross receipts of oil companies and at the same time to prevent such gross receipts tax from fueling inflation by prohibiting the pass through of such tax to the consumers of this state.

Therefore, it is the intent of the legislative that the gross receipts tax shall cease and terminate if such tax shall be permitted, either by judicial adjudication or by any formal opinion or ruling or in any other manner, to be included either directly or indirectly in the sales price of the products of the oil company.

The foregoing language suggests to the Court that the Legislators anticipated that the anti–pass through provision of the legislation might be challenged, apart from any attack on the tax itself, and that it might be struck down by the Courts with no threat to the continued collection of the tax. The fact that the State chose to make the taxes' survival dependent upon the survival of a provision which constitutes an exercise of the State's police power rather than taxing power does not, in the opinion of this Court, justify the application of the Tax Injunction Act.

The Court does not question the State's authority to enact a taxing statute, the survival of which is inextricably linked to the survival of legislation constituting an exercise of the State's police power. However, it does not accept the defendants' argument that the question of constitutionality of such an exercise of police power can be insulated from Federal judicial scrutiny through a legislatively imposed linkage

---

7. Although the State can label the anti–pass through provision any way it wishes, for the purpose of determining the applicability of 28 U.S.C. § 1341, the Federal definition of tax is to be employed. *Robinson Protective Etc. v. City of Philadelphia,* 581 F.2d 371, 375 (3d Cir. 1978).

with a state taxing measure.[8] Therefore, the Court finds that it has jurisdiction in these actions under 28 U.S.C. §§ 1331, 1337, 2201 and 2202 and hereby denies the defendants' motion to dismiss pursuant to the Tax Injunction Act.

## SUPREMACY CLAUSE

Plaintiffs seek judgment invalidating the anti–pass through provision on the grounds that it is pre–empted by the EPAA and the price control regulations promulgated thereunder and is thus void under the Supremacy Clause of the Constitution.

The Supremacy Clause provides that "... the Laws of the United States ... shall be the supreme Law of the Land, ... any thing in the Constitution or Laws of any State to the contrary notwithstanding." (U.S.Const. Art. VI, cl. 2).

The Supreme Court has frequently cautioned that in cases such as these involving a challenge to a State's police power under the Supremacy Clause that the Court must "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 157, 98 S.Ct. 988, 994, 55 L.Ed.2d 179 (1978), quoting from *Rice v. Sante Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). *See also Jones v. Rath Packing Co.*, 430 U.S. 519,

525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604, *reh'g denied* 431 U.S. 925, 97 S.Ct. 2201, 53 L.Ed.2d 240 (1977).

There are two recognized grounds for finding pre–emption of state legislation by federal law.[9] The first is where Congress has chosen to completely occupy the field, to the exclusion of the states, in which case states may not regulate within the field even when the regulation is in harmony with the federal scheme. *Jones v. Rath Packing Co., supra*, 430 U.S. at 525, 97 S.Ct. at 1309. The second is where, although Congress has not completely foreclosed state legislation in a particular area, the state law conflicts with a valid federal statute. *Ray v. Atlantic Richfield Co., supra*, 435 U.S. at 158, 98 S.Ct. at 994.

Congressional intent to totally occupy a particular field, precluding any state regulation may be "explicitly stated in the [federal] statute's language or implicitly contained in its structure and purpose." *Jones v. Rath Packing Co., supra*, 430 U.S. at 525, 97 S.Ct. at 1309. *See also City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 633, 93 S.Ct. 1854, 1859, 36 L.Ed.2d 547 (1973).

The Supreme Court in *Rice v. Santa Fe Railroad, supra*, 331 U.S. at 230, 67 S.Ct. at 1152, explaining that an implied congressional intent could be "evidenced in several ways", stated that:

---

8. In seeking dismissal of these actions under 28 U.S.C. § 1341, defendants ask the Court to closely examine the long history of hostility to government by Federal injunction and the traditional Federal policy of non–intervention in certain state governmental matters.

   In that regard, defendants point to the enactment of the Norris–LaGuardia Act of 1932, (29 U.S.C. §§ 105–115) which restricts the Federal Courts' power to issue injunctions in labor disputes and the Johnson Act of 1934, 28 U.S.C. § 1342, which prohibits Federal Courts from issuing injunctions of public utility rate orders and after which the Tax Injunction Act was "modeled". 81 Cong.Rec. 1415 (1937).

   It is interesting to note, in that regard, that the Johnson Act, which deals with what are in effect price control measures (public utility rates) precludes the issuance of Federal Court injunctions only if "[t]he order does not inter-

fere with interstate commerce". 28 U.S.C. § 1342(2). The Tax Injunction Act, of course, contains no such exception. While it is conjecture on the part of this Court, it would appear that Congress, in passing the Tax Injunction Act, anticipated that it would be applicable only in situations involving a state's internal fiscal affairs. Price controls, however, by their very nature are more apt to have an effect which reaches outside of the boundaries of the State, thus calling for the exception in the Johnson Act, and perhaps bolstering the Court's determination in these cases.

9. State statutes can also be pre–empted by Federal regulations properly promulgated under a Federal statute when there is a conflict between State and Federal regulations. *See e. g. Jones v. Rath Packing Co.*, supra, 430 U.S. at 536, 97 S.Ct. at 1315.

The scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for States to supplement it. [Citations omitted] Or the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject. [Citations omitted] Likewise, the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose.[10]

Under the second form of pre–emption, conflict voiding a state statute will be found:

"where compliance with both federal and state regulations is a physical impossibility ...," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–143, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), or where the state "law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941); *Jones v. Rath Packing Co., supra,* 430 U.S. at 526, 540–541, 97 S.Ct. at 1317. Accord, *De Canas v. Bica*, 424 U.S. 351, 363, 96 S.Ct. 933, 940, 47 L.Ed.2d 43 (1976).

*Ray v. Atlantic Richfield Co., supra,* 435 U.S. at 158, 98 S.Ct. at 994–995.

■ On occasion a pre–emption conflict may be found absent an actual conflict between state and federal law, where it is clear that Congress has addressed the issue and decided that the particular field should remain unregulated. As explained by the Supreme Court in *Bethlehem Steel Co. v. New York State Labor Relations Board,* 330 U.S. 767, 774, 67 S.Ct. 1026, 1030, 91 L.Ed. 1234 (1967) and recently reiterated in *Ray v. Atlantic Richfield Co., supra,* 435 U.S. at 178, 98 S.Ct. at 1004–1005:

"where failure of ... federal officials affirmatively to exercise their full authority takes on the character of a ruling that no such regulation is appropriate or approved pursuant to the policy of the statute," States are not permitted to use their police power to enact such a regulation. *Bethlehem Steel Co. v. New York State Labor Relations Board,* 330 U.S. 767, 774, 67 S.Ct. 1026, 1030, 91 L.Ed. 1234 (1947); *Napier v. Atlantic Coast Line R. Co.,* 272 U.S. 605, 47 S.Ct. 207, 71 L.Ed. 432 (1926).

However, as recently pointed out by Judge Blumenfeld in *Mobil Oil Corp. v. Dubno,* 492 F.Supp. 1004, 1010 (D.Conn. 1980) a Connecticut case also involving an anti–pass through provision enacted in conjunction with a gross receipts tax on oil companies in that State:

[the] mere failure to regulate, in and of itself, will rarely constitute an affirmative federal decision that "no such regulation is appropriate or approved" in light of federal policy. Rather, "[t]he pertinent inquiry [is] whether [federal authorities have] addressed and acted upon the question," whether they have given "careful consideration" to factors specified by Congress, and, after balancing the competing interests whether they have determined that no regulation, or limited regulation, is the proper way of achieving federal goals. *Ray v. Atlantic Richfield Co.,* ... 435 U.S. at 174, 177, 98 S.Ct. at 1002, 1004. ...

*Id.* at 1010.

■ Finally, it should be noted that a state law cannot escape invalidation on pre–emption grounds because its purpose promotes a valid state interest if its effect "frustrates the full effectiveness of federal law." *Perez v. Campbell,* 402 U.S. 637,

**10.** It must be kept in mind, however, that the existence of pervasive and complex regulations does not, in every case, demonstrate a Congressional intent to completely occupy a particular field. *See New York Dept. of Social Services v. Dublino,* 413 U.S. 405, 415, 93 S.Ct. 2507, 2514, 37 L.Ed.2d 688 (1973), in which the Supreme Court cautioned that:

The subjects of modern social and regulatory legislation often by their very nature require intricate and complex responses from Congress, but without Congress necessarily intending its enactment as the exclusive means of meeting the problem ....

651–652, 91 S.Ct. 1704, 1712, 29 L.Ed.2d 233 (1971).

The Court explained in *Perez* that:

We can no longer adhere to the aberrational doctrine ... that state law may frustrate the operation of federal law as long as the state legislature in passing its law had some purpose in mind other than one of frustration. Apart from the fact that it is at odds with the approach taken in nearly all our Supremacy Clause cases, such a doctrine would enable state legislatures to nullify nearly all unwanted federal legislation by simply publishing a legislative committee report articulating some state interest or policy–other than frustration of the federal objective–that would be tangentically furthered by the proposed state law.

■ Plaintiffs will be entitled to summary judgment on their pre–emption claims pursuant to Rule 56 of the Fed.R.Civ.P. "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving [parties are] entitled to judgment as a matter of law". Fed.R. Civ.P. 56(c).

After review of the papers submitted by the parties to the actions and analysis of the EPAA and the Price Regulations promulgated thereunder, the Court is of the opinion that there are no genuine issues as to any material fact on the pre–emption issue, and finds that plaintiffs are entitled to summary judgment on that claim.[11]

## THE EPAA AND THE FEDERAL REGULATORY SCHEME

*The Emergency Petroleum Allocation Act*

Congress enacted the EPAA in 1973 in response to the Arab oil embargo which had created shortages of various petroleum products which "constitute[d] a national energy crisis which [was] a threat to the pub-

lic health, safety, and welfare and [could] be averted or minimized most efficiently and effectively through prompt action by the Executive branch of Government." 15 U.S.C. § 751(a)(3).

The stated purpose of the Act was to:

... grant the President of the United States and direct him to exercise specific temporary authority to deal with *shortages* of crude oil, residual fuel oil, and refined petroleum products or *dislocations in their national distribution system.* ... [Emphasis supplied]

15 U.S.C. § 751(b).

As indicated in the preceding statutory language, the EPAA was initially considered by Congress to be a temporary measure enacted to deal with an emergency situation on a national level.

The President was required under the Act, to:

promulgate a regulation providing for the mandatory allocation of crude oil, residual fuel oil, and each refined petroleum product in amounts specified in (or determined in a manner prescribed by) and at prices specified in (or determined in a manner prescribed by) such regulation.

15 U.S.C. § 753(a).

Authorization was granted under the EPAA for the President to delegate his authority under the Act "to such officers, departments or agencies of the United States, or to any State (or officer thereof), as he deems appropriate." 15 U.S.C. § 754(b).

The Department of Energy (DOE), was created by Congress in August of 1977 (Department of Energy Organization Act, Pub. L.No. 95–91, § 201, 91 Stat. 569 (1977), and in February of 1978, the President delegated his authority under the Act to the Secretary of Energy who at the present time has control over the mandatory allocation pro-

---

**11.** There is no question but that the legal issues raised in plaintiffs' pre–emption claims are complex. The Second Circuit, however, in *S.E.C. v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978) has made it clear that summary judgment is not necessarily inappropriate simply because the legal issues are complex.

gram. Exec. Order No. 12038, 43 Fed.Reg. 4957 (Feb. 7, 1978).[12]

While the actual promulgation of regulations under the EPAA was left to the President, Congress did set forth guidelines defining the requisite area of coverage in the form of objectives which the regulations were to provide for "to the maximum extent practicable". 15 U.S.C. § 753(b)(1). Those objectives, set forth at 15 U.S.C. § 753(b)(1)(A)–(I) are:

(A) protection of public health (including the production of pharmaceuticals), safety, and welfare (including maintenance of residential heating, such as individual homes, apartments, and similar occupied dwelling units), and the national defense;

(B) maintenance of all public services (including facilities and services provided by municipally, cooperatively, or investor owned utilities or by any State or local government or authority, and including transportation facilities and services which serve the public at large);

(C) maintenance of agricultural operations, including farming, ranching, dairy, and fishing activities, and services directly related thereto;

(D) preservation of an economically sound and competitive petroleum industry; including the priority needs to restore and foster competition in the producing, refining, distribution, marketing, and petrochemical sectors of such industry, and to preserve the competitive viability of independent refiners, small refiners, nonbranded independent marketers, and branded independent marketers;

(E) the allocation of suitable types, grades, and quality of crude oil to refineries in the United States to permit such refineries to operate at full capacity;

(F) equitable distribution of crude oil, residual fuel oil, and refined petroleum products at equitable prices among all regions and areas of the United States and sectors of the petroleum industry, including independent refiners, small refiners, nonbranded independent marketers, branded independent marketers, and among all users;

(G) allocation of residual fuel oil and refined petroleum products in such amounts and in such manner as may be necessary for the maintenance of, exploration for, and production or extraction of–

(i) fuels, and

(ii) minerals essential to the requirements of the United States, and for required transportation related thereto.

(H) economic efficiency; and

(I) minimization of economic distortion, inflexibility, and unnecessary interference with market mechanisms.

Congress, in addition, directed that:

In specifying prices (or prescribing the manner for determining them), the regulation under subsection (a) of this section–

(A) shall provide for a dollar–for–dollar pass through of net increases in the cost of crude oil, residual fuel oil, and refined petroleum products at all levels of distribution from the producer through the retail level . . . .

In 1975, Congress added 15 U.S.C. § 760a to the EPAA. Energy Policy and Conservation Act. Publ.L.No.94–163, 89 Stat. 871 (1975). Whereas the imposition of allocation and price controls was mandatory under the 1973 Act, this section gave the President the authority to, in his discretion, and in accordance with the guidelines and procedural requirements set forth in the law, exempt "crude oil, residual fuel oil, or any refined petroleum product or refined product category" from the price and allocation regulations under the EPAA.

12. The President first delegated his authority under the EPAA to the Federal Energy Office (FEO) in December of 1973, Exec. Order No. 11748, 38 Fed.Reg. 33575. In June of 1974 the President abolished the FEO and delegated his authority to the Federal Energy Administration (FEA), which had been created by Congress in the Federal Energy Administration Act of 1974, Pub.L. 93–275, § 3, 88 Stat. 97 (1974). Exec. Order No. 11790, 39 Fed.Reg. 23185 (June 27, 1974). Authority remained in the (FEA) until delegated to the Secretary of Energy in 1978.

The criteria for amendment of regulations under § 753(a) is a determination by the President that:

such amendment is consistent with the attainment to the maximum extent practicable, of the objectives specified in section 753(b)(1) of this title and that the regulation, as amended, provides for the attainment to the maximum extent practicable, of such objectives.

15 U.S.C. § 760a(b).

Before any amendment to the regulations which pertains to either the allocation of or the price or manner of determining the price of crude oil, residual fuel oil or refined petroleum product could be promulgated, it had to be submitted for Congressional approval. 15 U.S.C. § 760a(C)(1) and (2).[13]

The President was also required to submit in support of the proposed amendment "a finding that such amendment [was] consistent with the attainment of the objectives specified in section 753(b)(1) of this title", and in the case of a proposed amendment to the price control regulations, "a finding that market forces [were] adequate to protect consumers and that exempting such oil or refined product category [would] not result in inequitable prices for any class of users of such oil or product." 15 U.S.C. § 760a(d)(1).

In addition, the President was required to submit with each proposed amendment a statement of his views as to:

"the potential economic impact (if any) of such amendment which, where practicable, shall include his views as to—

(i) the State and regional impacts of such amendment (including effects on governmental units);

(ii) the effects of such amendment on the availability of consumer goods and services; the gross national product; competition; small business; and the supply and availability of energy resources for use as a fuel or as feedstock for industry; and

(iii) the effects on employment and consumer prices; and

(B) in the case of an exemption [from the price control regulations] an analysis of the effects of such amendment on the rate of unemployment for the United States, the Consumer Price Index for the United States, and the implicit price deflator for the gross national product.

15 U.S.C. § 760a(d)(2).

Under the 1975 amendment to the EPAA, the President was also given standby authority to at any time reimpose allocation and price control regulations on any previously exempted oil or refined product "upon a determination by him that such regulation or order is necessary to attain, and is consistent with, the objectives specified in section 753(b)(1) of this title." 15 U.S.C. § 760a(f).

*Federal Regulation Under the EPAA*

Comprehensive regulations governing the allocation and pricing of petroleum products were promulgated and implemented in response to the EPAA mandate. The petroleum pricing regulations, at subpart E, 10 C.F.R. §§ 2121.81–85 control the prices charged by refiners for petroleum products and specify the method to be used in computing price increases.

Under the pricing regulations the "maximum allowable price" which refiners can charge for covered products is "the weighted average price at which the covered product was lawfully priced in transactions with the class of purchaser concerned on May 15, 1973, . . . plus increased product costs and increased non–product costs incurred between the month of measurement and the month of May 1973". 10 C.F.R. § 212.82.

Initially, the regulations allowed refiners to pass–through non–product costs only upon notification to and approval of the FEA, the agency to which the President had first delegated his authority under the EPAA. However, in December of 1974 the FEA amended the regulations by recognizing eight specific categories of increased

---

**13.** Effective May 31, 1979, proposed amendments exempting products from the mandatory allocation and price regulations need not be submitted for Congressional approval. 15 U.S.C. § 760g; 44 Fed.Reg. 19425 (1979).

non–product costs, which refiners could pass–through without prenotification. 39 Fed.Reg. 42368 (December 5, 1974). The amendment also left the door open to seek agency permission for the pass–through of "disproportionately high non–product cost increases which [did] not fall into one of the categories defined by FEA", on a case–by–case basis. *Id.*

In January of 1977, the regulations concerning the pass–through of non–product costs were further amended to add additional categories.[14] 42 Fed.Reg. 5023 (January 27, 1977). As a result of this amendment, refiners were and are presently allowed to include in the price of covered products the dollar amount of their increased costs for "federal, state, and local property, excise, franchise and other similar taxes". 10 C.F.R. § 212.83(c)(2)(iii)(E)(7). The regulation specifically provides that "[f]ederal, state and local income taxes are not includable in this amount". *Id.*

The regulations also dictate the manner in which allowable cost increases are to be allocated among a refiner's customers. 10 C.F.R. § 212.83(c) and (h). The "equal application rule", at 10 C.F.R. § 212.83(h) encourages refiners to allocate increases equally among classes of purchasers by requiring that the refiner in determining the amount of its unrecouped cost increases to arrive at the maximum allowable price which can be charged in the subsequent month,

... shall calculate its revenues as though the greatest amount of increased costs actually added to any May 15, 1973, selling price of the product concerned and included in the price charged to any class of purchaser, had been added, in the same amount, to the May 15, 1973, selling price of that product and included in the price charged to each class of purchaser.

*Id.*

■ In other words, even if a refiner has not applied cost increases equally among all classes of purchasers, the refiner will be *deemed* to have done so and will not have the deemed amounts available for further increases.[15]

At the present time only automotive gasoline, propane and certain natural gas liquids remain subject to the previously described price control regulations (10 C.F.R. §§ 210.35, 212.56–62); all other petroleum products having been exempted in accordance with the procedures set forth at 15 U.S.C. § 760a.[16]

In each instance in which an administrative decision has been made to exempt a particular petroleum product from regulation, it has been based upon findings (1) that the product is not in short supply; (2) that deregulation will not have an adverse impact on supply; (3) that competition and market forces provide adequate protection for consumers (or possibly greater protection); (4) that exemption will not result in

14. For a complete list of non–product costs which may be included in the price of covered products see 10 C.F.R. § 212.83(c)(2)(iii)(E).

15. The non–product cost increases cannot necessarily be included in product prices immediately as incurred. Rather the costs are placed in the refiners "bank", to be passed through in accordance with the price control regulations at 10 C.F.R. § 212.83(c). Both actual price increases and increases deemed to have occurred under the equal application rule reduce the amount in the refiners "bank". Thus, a refiner is penalized for failure to apply cost increases equally to all classes by the reduction in its "bank" for cost increases not actually made.

The regulations at 10 C.F.R. § 212.83(f) set forth the sequence in which increased costs shall be deemed to have been recovered.

16. The products which have been exempted are residual fuel oil, 41 Fed.Reg. 13896 (April 1, 1976); No. 2 heating oil and No. 2–D diesel fuel, 41 Fed.Reg. 24518 (June 16, 1976); No. 1 heating oil, No. 1–D diesel fuel and kerosene, 41 Fed.Reg. 24518 (June 16, 1976); naphthas, gas oils, benzene, greases, hexane, lubricant base oil stocks, lubricants, special naphthas (solvents), toluene, unfinished oils, xylene, and other finished products, 41 Fed.Reg. 30096 (July 22, 1976); aviation turbine fuel (naphtha–based and kerosene–base) 41 Fed.Reg. 40452 (Sept. 20, 1976); aviation fuel (kerosene–type) and aviation gasoline, 44 Fed.Reg. 7070 (Feb. 5, 1979); and butane and natural gasoline. 44 Fed.Reg. 70118 (Dec. 6, 1979) Codified at 10 C.F.R. § 210.35.

inequitable prices for any class of users; and (5) that exemption is consistent with the attainment of the objectives set forth at section 4(b)(1) of the EPAA.

It should be noted that the price control regulations on presently exempt petroleum products have not been repealed, but rather have been "in effect converted to standby status, so that in the event of shortages or other occurrences which might require reimposition of controls, they may be quickly put into effect." 41 Fed.Reg. 30096, 30098 (July 22, 1976).[17]

### ANALYSIS OF PLAINTIFFS' PRE–EMPTION ARGUMENT

The anti–pass through provision contained in the New York gross receipts tax legislation applies both to petroleum products which are currently subject to the federal price control regulations and those which are presently exempt. Plaintiffs' pre–emption claims extend to both.

*Applicable Test of Pre–emption*

Plaintiffs rely upon both of the judicially recognized grounds for pre–emption of state law by Federal statutes and regulations. Defendants, however, contend that the question of pre–emption is not to be resolved through application of the "exclusive occupation" or "conflict" tests repeatedly articulated by the Supreme Court in Supremacy Clause cases, but rather exclusively through application of section 6(b) of the EPAA, 15 U.S.C. § 755(b). That section provides that:

> The regulation under section 753 of this title and any order issued thereunder, shall preempt any provision of any program for the allocation of crude oil, residual fuel oil, or any refined petroleum product established by any State or local government if such provision is in conflict with such regulation or any such order.

Furthermore, defendants assert that the term "conflict" as used in section 6(b) is restricted to *actual* conflicts. Thus, according to defendants, the traditional judicial use of the term "conflict" as including instances where the consequences of a state law "sufficiently injure the objectives of the federal program", *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 583, 99 S.Ct. 802, 809, 59 L.Ed.2d 1 (1979) is improper in these cases.

Defendants in asserting their position, rely on state court cases interpreting section 6(b) as well as a letter written by the Acting General Counsel of the DOE applying the actual conflict standard. Plaintiffs dispute the correctness of defendants' definition of "conflict" in section 6(b) and argue that, in any event, the section does not constitute the sole test of pre–emption in these cases. The Court agrees.

■ Any possibility that the existence of a specific pre–emption provision in Federal legislation precludes application of the general pre–emption principles is quickly dispelled by the decision of the Supreme Court in *Jones v. Rath Packing Co., supra*. The Court in *Jones*, after concluding that an express pre–emption provision did not invalidate a state law, found that the finding did not resolve the case because the Court still had to "determine whether the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress". *Id.* 430 U.S. at 540–541, 97 S.Ct. at 1317.

Defendants' reliance on *Governor of the State of Maryland v. Exxon*, 279 Md. 410, 370 A.2d 1102 (1977), *aff'd on other grounds*, 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978) which found section 6(b) provided the sole test for pre–emption is misplaced, since that case was decided prior to *Jones* which dictates a contrary result.

■ Nor does the letter written by the Acting General Counsel for DOE in which he, relying exclusively on the section 6(b) pre–emption test, opined that the state anti–pass through provision did not conflict

---

17. 41 Fed.Reg. 30096, 30098 (July 22, 1976) concerns the exemption from price controls of naphthas and gas oils. The agency reports on the exemption of other products contain similar language concerning the conversion of the regulations to standby status. See n. 16, *supra*, for Federal Register citations relating to specific exemption determinations.

with the EPAA and its regulations, dictate a finding by this Court that section 6(b) provides the exclusive pre–emption test.[18] While interpretation of statute by the agency charged with its administration is "entitled to substantial deference", *Quern v. Mandley*, 436 U.S. 725, 738, 98 S.Ct., 2068, 2076, 56 L.Ed.2d 658 (1978), it is clearly not decisive in every instance. The Supreme Court in *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944), explained that:

> . . . rulings, interpretations and opinions of the Administrator under [an] Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. *The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements and all those factors which give it power to persuade if lacking power to control.* (Emphasis supplied)

Before applying the foregoing standard to the Acting General Counsel's letter in this case, it should be pointed out that the DOE itself places relatively little weight on communications of this type. The regulations at 10 C.F.R. §§ 205.80–.86 set forth the procedure for obtaining official DOE interpretations. Those procedures were not followed with regard to the opinion letter relied on by defendants in these cases. With respect to the type of opinion letter relied upon by the defendants herein, 10 C.F.R. §§ 205.80 provides that:

> Responses, which may include verbal or written responses to general inquiries or

to other than formal written requests for interpretations filed with the General Counsel or his delegate or a Regional Counsel, *are not interpretations and merely provide general information.* (Emphasis supplied)

Under the *Skidmore* test, the opinion letter is entitled to little weight with regard to the pre–emption issue. After concluding that the anti–pass through provision was not pre–empted by Federal law, the author of the letter offered three caveats, one of which was that the time constraints he was under in responding to the request for an opinion, "did not permit an exhaustive analysis of the question". Thus, by his own admission, the Acting General Counsel's consideration of the pre–emption issue was less than thorough.

Furthermore, as shall be demonstrated at a later point, the conclusion reached in the letter is inconsistent with expressions of agency policy contained in several earlier DOE administrative opinions. Finally, the Court is convinced that the conclusion in the letter was, in light of *Jones*, reached either without reference to, or through the incorrect application of, judicially determined pre–emption principles.

Thus, the plaintiffs are not limited to section 6(b) in pursuing their pre–emption claims but rather are free to rely upon both of the judicially accepted grounds for pre–emption as well. However, since the Court is of the opinion that the anti–pass through provision must be invalidated under the "conflict" standard, it will be unnecessary to determine whether Congress intended exclusive Federal control over the allocation and pricing of petroleum products, excluding the State from exercising its police power in those areas.[19]

---

**18.** The letter was written by Eric J. Fygi, Acting General Counsel of the DOE on June 10, 1980, in response to a letter of the same date from the Governor of New York State, seeking an opinion as to whether the anti–pass through provision would conflict with the EPAA and the regulations promulgated thereunder.

Although section 6(b) was not specifically referred to, it is clear that it was relied upon exclusively by Mr. Fygi in reaching his determination.

**19.** In keeping with the traditional judicial reluctance to find Federal pre-emption of a State's exercise of police power (*See Ray v. Atlantic Richfield, Co., supra*), the Court has attempted to make its finding of pre–emption in these cases on as narrow a ground as possible. In any event, the fact that Congress included an express pre–emption provision which did not result in occupation of the entire field, makes it unlikely that plaintiffs would be successful on that pre–emption ground.

*The Pre–emption Conflict as to "Non–Exempt" Petroleum Products*

As one of the sponsors of the EPAA, Senator Henry Jackson stressed that it was crucial that Congress "build a coordinated and rational fuels and energy policy". 119 Cong.Rec. 12317, *quoted in* S.Rep.No. 93–159, 93d Cong., 1st Sess. 21 (1973). Later, as floor manager of the bill, the Senator warned that:

> [I]f the Federal Government fails to establish effective regional or national allocation plans, we will invite piecemeal action by the States. Our fuel shortage problems are national problems; they must be recognized and resolved at the Federal level.

119 Cong.Rec. 17764 (1973).

Recognizing that the "self–regulating laws of supply and demand [were] not currently operating in the petroleum product market", the House Committee on Interstate and Foreign Commerce concluded that it was "imperative that the Federal government . . . accept its responsibility to intervene in these markets to preserve competition". H.R.Rep.No. 93–159, 93d Cong., 1st Sess., *reprinted in* [1973] U.S.Code Cong. & Admin.News, pp. 2582, 2586.

As previously noted, one of the express statutory objectives to be considered in the promulgation of mandatory allocation and price regulations was the "equitable distribution of . . . refined petroleum products at equitable prices among all regions and areas of the United States. 15 U.S.C. § 753(b)(1)(f). Explaining the Congressional intent with regard to equitable prices, the Congressional conferees stated that:

> The reference to equitable prices in the bill is specifically intended to emphasize that one of the objectives of the mandatory allocation program is to prevent price gouging or price discrimination

which might otherwise occur on the basis of current shortages. *On the other hand, it is contemplated that prices for allocated fuels will be set at levels or pursuant to methods which will permit adequate compensation to assure that private property is not implicitly confiscated by the government.* Most importantly, the President must, in exercising his authority, strike an equitable balance between the sometimes conflicting needs of providing adequate inducement for the production of an adequate supply of product and of holding down spiraling consumer costs. (Emphasis supplied)

H.R.Conf.Rep.No. 93–628, 93d Cong., 1st Sess., *reprinted in* [1973] U.S.Code Cong. & Admin.News, pp. 2702–2703.

Thus, it is clear that Congress looked upon the EPAA as legislation directing the establishment of a flexible national program for dealing with what was hoped to be a temporary crisis in an equitable manner, providing to the greatest extent possible for a balancing of the interests of both consumers and refiners of petroleum products.

Plaintiffs [20] contend that the anti–pass through provision stands as an obstacle to the fulfillment of that Congressional goal and charge more specifically that the provision conflicts with the mandatory Federal price regulations by not allowing refiners and sellers of petroleum products to recapture increased costs engendered by state franchise taxes on a dollar–for–dollar basis.[21] According to plaintiffs, the New York gross receipts tax is a franchise tax which falls within that group of taxes which may under the regulations be passed on to purchasers of petroleum products through increase in prices. 10 C.F.R. § 212.83(c)(2)(iii)(E)(7). The anti–pass through provision, however, prevents the

---

**20.** Plaintiff NEPCO alleges in its complaint that its New York sales are limited to residual fuel oil, presently exempt from regulation under the EPAA. Therefore, the discussion concerning nonexempt products does not apply to NEPCO.

**21.** Plaintiffs in the Mobil Oil case allege in addition that the anti–pass through provision

conflicts with the mandatory price regulations by imposing a sequence of cost recovery in conflict with the sequence set forth in the Federal regulations at 10 C.F.R. § 212.83(f). It will, however, be unnecessary for the Court to reach that argument.

plaintiffs from passing on that cost in the prices charged for products sold within New York State.

Thus, recovery of increased costs incurred as a result of the gross receipts tax will be limited to amounts which could be passed through to purchasers in other states. However, plaintiffs argue that under the Federal regulations they will not be able to recover the entire amount from out–of–state purchasers because of the equal application rule. 10 C.F.R. § 212.83(h). Under that rule, as previously explained, New York prices would be deemed to have increased in the same amount as those in other states, and that amount would be lost from plaintiffs' "banks" and unavailable for future recovery.

Defendants argue in response that (a) the New York gross receipts tax is not one which may be passed on to purchasers under 10 C.F.R. § 212.83(c)(2)(iii)(E)(7), and (b) the Federal price control regulations merely set "maximum allowable prices" and bestow no right upon refiners and sellers to charge those prices.[22] The Court finds both of these arguments unconvincing.

In asserting the position that the New York gross receipts tax is not one which can be passed through under 10 C.F.R. § 212.-83(c)(2)(iii)(E)(7), defendants argue that the intent behind the regulation allowing the pass through of certain taxes (i. e., property, excise, franchise and similar taxes) while not permitting the pass through of income

taxes was to distinguish between those taxes which the taxing authority expected to be passed on and those which were to be born by the taxpayer. Defendants then reason that the regulation should, therefore, be read as a presumption to operate only in the absence of an explicit expression of intention. Defendants, however, fail to offer support for this theory.

Defendants also seem to suggest that the gross receipts tax, because it taxes *all* receipts and not merely receipts from sales, is actually along the lines of an income tax, and cannot be passed through under 10 C.F.R. § 212.83(c)(2)(iii)(E)(7) on that basis.[23] Neither is this claim convincing, especially in light of the following statutory language contained in the tax legislation:

> § 182 Additional *franchise tax* on certain oil companies. 1. Notwithstanding any other provision of this chapter, or of any other law, an annual tax is hereby imposed upon every oil company ... *for the privilege of exercising its corporate franchise* .... (Emphasis supplied)

L.1980, ch. 271, § 4.

The foregoing language establishes to the satisfaction of this Court that the gross receipts tax is a state franchise tax which falls within that group of taxes which may be passed through under 10 C.F.R. § 212.-83(c)(2)(iii)(E)(7).[24]

---

**22.** Defendants also renew the argument first made in conjunction with the motion to dismiss that the anti–pass through provision is not a price control measure because although it admittedly has an incidental effect on price, it does not "fix" prices. Rather, defendants claim it is a "rule of tax incidence", and as such should not be pre–empted by Federal law in this instance.

The Court remains convinced that regardless of the terminology employed by defendants, the anti–pass through provision is indeed a price control measure. *See United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 222–223, 60 S.Ct. 811, 844, 84 L.Ed. 1129 (1940) (finding that under the Sherman Antitrust Act price fixing is not limited to the setting of uniform or inflexible prices); *Perez v. Campbell, supra,* 402 U.S. at 651–652, 91 S.Ct. at 1712 (pre–emp-

tion is not determined by reference to state statutory labels).

The anti–pass through, regardless of what defendants call it, "distorts market conditions by keeping prices artificially low in [New York]". *See Mobil Oil v. Dubno, supra,* 492 F.Supp. at 1013 n. 10.

**23.** Defendants recognize that no deductions are allowed as they generally are with an income tax, but in support of their argument that the gross receipts tax is an income tax, justify the failure to allow deductions by the low tax rate.

**24.** Defendants point out that 10 C.F.R. § 212.-83(c)(2)(iii)(E)(7) allows only taxes which are attributable to refining operations to be passed through. Since the New York gross receipts tax taxes all of an oil company's receipts, and not just those attributable to refining operations, defendants suggest that there is a materi-

Defendants argue, however, that even if the regulation allows plaintiffs to increase prices of non–exempt petroleum products to reflect costs incurred by the New York gross receipts tax, it does not give them an absolute right to do so. Rather, according to defendants, the regulations merely establish "maximum allowable prices", and, therefore, no conflict is presented by the State's setting more restrictive price limitations. Defendants' position simply does not hold up under scrutiny.

■ As previously noted, Congress, in directing the President to promulgate mandatory allocation and price regulations under the EPAA, provided him with guidelines in the form of a list of objectives to be met to the "maximum extent practicable". 15 U.S.C. § 753(b)(1)(A)–(I). Therefore, in determining whether the anti–pass through provision "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress", *Ray v. Atlantic Richfield Co., supra,* the Court must look not only at *particular* the regulation but at the objectives which the agency sought to further by its promulgation.[25] If the consequences of the anti–pass through provision "sufficiently injure the objectives of the federal program", *Hisquierdo v. Hisquierdo, supra,* a conflict must be found and the provision invalidated under the Supremacy Clause. Such a conflict exists in this instance with regard to non–exempt petroleum products.

The regulations involved in plaintiffs' pre–emption challenge are 10 C.F.R. § 212.-83(c)(2)(iii)(E)(7) and the equal application rule. 10 C.F.R. § 212.83(h). One of the objectives at 15 U.S.C. § 753(b)(1), the "preservation of an economically sound and competitive petroleum industry", [15 U.S.C. § 753(b)(1)(D)] is furthered by allowing refiners to pass through those taxes which are recognized as costs of doing business. 10 C.F.R. § 212.83(c)(2)(iii)(E)(7). By precluding the pass through of the New York gross receipts tax to purchasers in New York, the anti–pass through provision conflicts with the articulated policy allowing the pass through, and the more general Congressional intent that prices for petroleum products "be set . . . pursuant to methods which will permit adequate compensation to assure that private property is not implicitly confiscated by the government". H.R.Conf. Rep.No. 93–628 *supra,* U.S.Code Cong. & Admin.News 1973, p. 2703.

Another of the objectives, set forth at 15 U.S.C. § 753(b)(1)(F), provides for the "equitable distribution of . . . refined petroleum products at equitable prices among all regions and areas of the United States". The equal application rule exists to help insure equitable pricing on a national basis. The application of the rule, and the detrimental effect that it would have on the oil companies' ability to increase prices on a dollar–for–dollar basis to cover costs incurred through the imposition of the New York gross receipts tax have already been explained.[26]

al issue of fact precluding summary judgment as to what portion, if any, of the gross receipts tax can be passed through as attributable to refining operations.

The Court, however, does not agree that this question raises a material issue of fact. Even if oil companies could not pass through all of the costs incurred through the tax, any proportion allocatable to refining (and clearly some portion would be) which could be passed through but for the anti–pass through provision presents a conflict problem.

25. Referring to the objectives set forth at 15 U.S.C. § 753(b)(1), the Temporary Emergency Court of Appeals in *Mobil Oil v. Department of Energy,* 610 F.2d 796, 801 (Em.App.1979) explained that:

No single factor is inherently more important than any of the other factors. Instead, as this Court has held, all nine factors are to be balanced objectively.

26. Defendants suggest that there is no conflict in these cases with regard to the equal application rule because plaintiffs presently have "banks" which are so large that it is unlikely they will be depleted by the time price controls expire in September of 1981, and the only material aspect of the rule is to reduce those "banks".

While defendants assert that the size of plaintiffs' "banks" raises a material issue of fact, the Court once again disagrees. The conflict exists regardless of the size of plaintiffs' "banks".

■ However, perhaps even more crucial than the harm which would be done to plaintiffs through application of the rule, which in itself suggests an impermissible conflict, is the fact that the anti–pass through provision flies in the face of the specific Congressional objective which the equal application rule was enacted to further. While the Federal policy supports "equitable distribution" and "equitable prices" among "all regions and areas of the United States", 15 U.S.C. § 753(b)(1)(F), New York is seeking to insulate its citizens from increased costs resulting from a local tax while allowing the burden of the tax to fall upon the shoulders of non–New Yorkers.[27]

Such a result frustrates, not only express Congressional policy, but thwarts the articulated DOE policy of waiving the equal application rule and allowing local taxes to be passed through solely to customers within the taxing jurisdiction. In *Mobil Petroleum Company*, 5 DOE § 81, 188 at 82, 989 (1977) the DOE found that a Guam gross receipts tax could be recovered solely in the taxing jurisdiction, reasoning that:

> [I]f Mobil Petroleum were required to recover a portion of the Guam gross receipts tax by increasing its prices for covered products sold to purchasers outside the territory of Guam, those non–Guamian purchasers would in effect be required to bear a portion of the burden of a Guamian tax on Guamian consumption of petroleum products. *This result would frustrate one of the objectives that Congress sought to further in the Emergency Petroleum Allocation Act of 1973*

(EPAA), Pub.L. No. 93–159, that of pro- viding for the "equitable distribution of ... refined petroleum products at equitable prices among all regions and areas of the United States." (citation omitted)

Because the anti–pass through provision conflicts in the manner discussed with 10 C.F.R. §§ 212.83(c)(2)(iii)(E)(7) and 212.-83(h), as well as the aforementioned objectives at 15 U.S.C. § 753(b)(1)(D) and (F) and the Congressional intent as expressed in the legislative history, its validity cannot be upheld under the Supremacy Clause with regard to petroleum products presently subject to the mandatory price controls.[28]

### The Pre–emption Conflict as to "Exempt" Petroleum Products

As already pointed out, the 1975 amendment to the EPAA gave the President, or his delegate, the authority to exempt petroleum products from regulation in accordance with the procedures contained in 15 U.S.C. § 760a. Many of the petroleum products subject to the New York gross receipts tax are presently exempt from regulation. As also previously noted, plaintiffs claim that the anti–pass through provision passed in conjunction with that tax is pre-empted as to those exempt products because it conflicts with the Federal regulatory policy under the EPAA.

An almost identical pre–emption issue was recently before the District Court in Connecticut in *Mobil Oil v. Dubno, supra*. The State of Connecticut enacted legislation imposing on oil companies a two per cent tax on their gross receipts from sales in Connecticut. Section 13(a) of the Con-

---

**27.** Defendants attempt to differentiate the New York gross receipts tax from other gross receipts taxes which have been imposed on oil companies primarily because it taxes *all* receipts from *all* sources. L.1980, ch. 271 § 4.

However, the tax is limited through the application of a statutory formula to the portion of receipts allocated to the State of New York, making it, in effect, a local tax. The fact that it applies to all sources of income rather than only receipts from the sale of petroleum products suggests only that there will conceivably be sources of income upon which the tax must be paid but which will be unrelated to the EPAA or the mandatory price regulations.

**28.** Although compliance with the mandatory price control regulations and the anti–pass through provision would not be impossible so as to create an *actual* conflict under 15 U.S.C. § 755(b), as defendants suggest that section should be read, the anti–pass through provision would be pre–empted under that section by use of the judicially accepted definition of conflict in pre–emption cases.

The section refers only to programs "for the allocation of ... petroleum products". However, legislative history suggests and defendants agree that programs for the pricing of petroleum products would be included.

necticut legislation contained a statement that the intent of the legislation was that the tax would constitute a part of each company's operating overhead. Section 13(b) forbids companies from raising wholesale prices in Connecticut on petroleum products presently exempt from regulation, by any higher amount than the average amount by which it raises prices "in all ports on the eastern coast of the United States." *Id.*, 492 F.Supp. at 1006.

Judge Blumenfeld found that section 13(b) was a price control mechanism which frustrated the effectiveness of Federal law in a number of ways. He proceeded to declare the section unconstitutional as in violation of the Supremacy Clause.

There are obvious differences in the legislation, although none quite so drastic as defendants would have the Court believe. In fact, the Court sees none which in itself would dictate a contrary result in this action. If anything, the New York anti–pass through constitutes an even more imposing price control regulation in that it applies to both exempt and non–exempt petroleum products and, in addition, attempts to totally insulate New York from any of the burden of the tax, thus creating the possibility for even more severe market distortion than with the Connecticut case.

The decision in *Mobil Oil Corp. v. Dubno*, was reached after a thorough analysis of the legislative history of the EPAA, the statutory language, and the regulations themselves. As discussed below, this Court believes that the decision in *Dubno* is correct, and that Judge Blumenfeld's analysis is for the most part applicable in these cases.

Plaintiffs in these actions argue that in choosing to exempt certain petroleum products from price control regulations, the DOE (or predecessor agency) did not intend to cease regulating with regard to those products,[29] thereby presumably leaving the area wide open for the imposition of state

regulation. Instead plaintiffs contend, the Federal authorities have " 'addressed and acted upon the question' ", and after giving " 'careful consideration' to factors specified by Congress, they have determined that no regulation, or limited regulation, is the proper way of achieving federal goals". *Mobil Oil Corp. v. Dubno, supra*, 492 F.Supp. at 1010, *quoting in part from Ray v. Atlantic Richfield Co., supra*.

Furthermore, plaintiffs assert, allowing operation of the anti–pass through provision would frustrate the satisfaction of the objectives set forth in the EPAA at 15 U.S.C. § 753(b)(1). There is ample support for plaintiffs' position in the legislative history of the Act, the statutory language and the manner in which the regulations have been converted to standby status with the DOE maintaining a close watch over supply and market conditions.

When enactment of the EPAA was originally being considered by Congress, the Committee conferees noted that:

> The committee recognizes that [price controls] necessarily distort the economy and interfere with a free market mechanism. It is the intent of this legislation that economic distortion and interference be minimized to the extent practicable. The President should assure himself that his actions interrupt existing supply mechanisms only when necessary to permit the accomplishment of [EPAA] objectives.

H.R.Conf.Rep.No. 93–628, 93d Cong., 1st Sess. 24 (1973), U.S.Code Cong. & Admin. News 1973, p. 2701. Thus, it is clear that Congress considered price controls a necessary (but hopefully temporary) evil.

While the EPAA was enacted as a temporary measure to deal with a crisis situation during discussions, in 1975, concerning the enactment of the Energy Policy and Conservation Act (EPCA), Publ.L. No. 94–163, 89 Stat. 871 (1975), Congress recognized that:

> directed that prices be allowed to be determined by free market was still classified by the Court as a regulation within section 4(a) of the EPAA.

---

29. Plaintiffs in the Mobil Oil case rely for support on the decision in *Consumers Union of U. S., Inc. v. Sawhill*, 525 F.2d 1068 (Em.App. 1975) (en banc), in which a regulation which

The fundamental reality is that this nation has entered a new era in which energy resources previously abundant, will remain in short supply, retarding our economic growth and necessitating an alteration in our life's habits and expectations. *The Arab embargo raised public consciousness of energy problems and underscored more effectively than could any other event the need for policy decisions at the national level.* (Emphasis supplied)

H.R.Rep.No. 94–340, 94th Cong., 1st Sess., *reprinted in* [1975] U.S.Code Cong. & Admin.News, pp. 1762, 1963.

The recognition on the part of Congress that the United States was entering a new era with regard to energy resources which necessitated a national energy policy belies defendants' argument that the 1975 amendment to the EPAA signaled a return to the *status quo ante*, allowing states to regulate freely with regard to petroleum products.

While defendants correctly point out that in amending the EPAA in 1975, Congress intended "a gradual return to an unregulated market", S.Conf.Rep.No. 94–516, 94th Cong., 1st Sess. 203 (1975), U.S.Code Cong. & Admin.News 1975, p. 2045, the return to a petroleum market totally unfettered by Federal controls has not yet occurred even as to exempt products.

Just as the price control regulations themselves must provide for the satisfaction of the objectives set forth at 15 U.S. § 753(b)(1), any decision to exempt a product from the regulations must likewise be based upon "a finding that such amendment is consistent with the attainment of the objectives specified in section 753(b)(1) . . .," 15 U.S.C. § 760a(d)(1). Therefore, exempting a product from the price control regulations, rather than constituting an end to Federal regulation over those products, represents an affirmative administrative determination that "no such regulation is appropriate . . . pursuant to the policy of the statute . . .," *Ray v. Atlantic Richfield Co., supra. See also Mobil Oil Co. v. Dubno, supra.*

Furthermore, agency action taken thus far under 15 U.S.C. § 760a has reflected a cautious, watchful approach to deregulation. As previously noted, price control regulations formerly applicable to presently exempt products have not been repealed but put on standby status to allow quick reactivation if necessary. In addition, the DOE has continued to closely monitor the market situation with regard to the exempt products.[30] This Court is not required to, nor is it in a position to, make a finding as to when, if ever, a return to an unregulated market will occur. It may be on September 30, 1981, the date presently set for expiration of Federal price controls. 15 U.S.C. § 760g. Then again, in light of the Congressional recognition that the United States has entered a "new era" necessitating "policy decisions [with regard to energy resources] at the national level", H.R. Rep.No. 94–340, *supra*, U.S.Code Cong. & Admin.News 1975, p. 1762, Federal control may extend far beyond that date.

In any event, at the present time, regulatory control over even the exempt petroleum products is, as previously demonstrated, still substantial. As with the Connecticut price control legislation, the anti–pass through provision in the New York gross receipts tax "frustrates the full effectiveness" of the present Federal regulatory policy under the EPAA in several ways.

Aside from imposing price controls in an area which Federal authorities have determined should be free of price regulation, the anti–pass through provision conflicts with the objectives which the Federal agencies were obligated to consider in making decisions to deregulate. Just as was recognized in *Mobil Oil Co. v. Dubno, supra,* 492 F.Supp. at 1014:

preventing suppliers from fully recovering, through prices charged in [New York], the true economic cost of products sold in [New York] . . . will induce suppliers to sell their products in other

---

**30.** For example, a public hearing was scheduled in 1977 on the need for a price monitoring system for middle distillates. Such a system was adopted. 42 Fed.Reg. 54444 (Oct. 6, 1977).

states, risking the very "supply problems" and "market distortions", that DOE in removing controls, endeavored to eliminate.

The provision presents a serious threat to the "equitable distribution of ... refined petroleum products at equitable prices among all regions and areas of the United States," 15 U.S.C. § 753(b)(1)(F), and "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in enacting the EPAA. *Ray v. Atlantic Richfield Co., supra.*[31]

Because the anti–pass through provision conflicts with the Federal policy under the EPAA with regard to presently exempt petroleum products in the foregoing manner, its validity cannot be upheld under the Supremacy Clause.

## RELIEF

This Memorandum–Decision explains the reasoning behind the September 4, 1980, Order of this Court, denying defendants' motion to dismiss and granting plaintiffs' motions for summary judgment· declaring the anti–pass through provision of the New York gross receipts tax unconstitutional as in violation of the Supremacy Clause and enjoining its enforcement. The Court by this Memorandum–Decision reaffirms its findings as contained in the September 4, 1980, Order and hereby incorporates this Decision therewith.

IT IS SO ORDERED.

---

**31.** Also relevant in this regard is the DOE policy favoring recovery of increased costs engendered from local taxes of the type involved herein, solely from purchasers in the taxing jurisdiction. *Mobil Petroleum Co., supra.* New York State seeks the exact opposite result.