**ISLA PETROLEUM CORPORATION, et al., Plaintiffs-Appellees,**

v.

**PUERTO RICO DEPARTMENT OF CONSUMER AFFAIRS, et al., Defendants-Appellants.**

No. 1–16.

Temporary Emergency Court of Appeals.

Argued Oct. 10, 1986.

Decided Dec. 29, 1986.

Lynn R. Coleman and Douglas G. Robinson, Skadden, Arps, Slate, Meagher & Flom, Washington, D.C., were on the brief, for defendants-appellants.

Rafael Perez-Bachs, Ana Matilde Nin, Nestor Mendez-Gomez, Maggie Correa-Aviles, McConnell, Valdes, Kelley, Sifre, Griggs & Ruiz-Suria, San Juan, Puerto Rico, were on the brief, for plaintiffs-appellees The Shell Co., Ltd., Mobil Oil Caribe, Inc. and Phillips Puerto Rico Core, Inc., along with Noel S. Gonzalez-Miranda and Mario L. Paniagua, Sweeting, Gonzalez & Cestero, San Juan, Puerto Rico, on the brief, for plaintiff-appellee Caribbean Gulf Refining Corporation and Igor Dominguez, William Estrella Law Offices, Old San Juan, Puerto Rico, on the brief for plaintiff-appellee Texaco Puerto Rico, Inc.

Jaime Sifre-Rodriguez and Luis Sanchez Betances, Cepeda, Sanchez-Betances & Sifre, Hato Rey, Puerto Rico, along with Donald B. Craven, Mark L. Evans, and James P. Tuite, Miller & Chevalier, Chartered, Washington, D.C., on the brief, for plaintiff-appellee Esso Standard Oil Co., P.R.

Alvaro R. Calderon, Jr., Hato Rey, Puerto Rico, was on the brief for plaintiffs-appellees Isla Petroleum Corp. and Gasolinas De Puerto Rico Corp.

Daniel Joseph and Thomas A. Lorenzen, Akin, Gump, Strauss, Hauer & Feld, Washington, D.C., for amicus curiae American Petroleum Institute.

Before CHRISTENSEN *, ESTES, and JAMESON, Judges.

* Judge Christensen filed a dissenting opinion.

JAMESON, Judge:

Defendants-appellants, Puerto Rico Department of Consumer Affairs (DACO), *et al.*, have appealed from an order of the United States District Court for the District of Puerto Rico, enjoining them from implementing or enforcing orders fixing prices or profit margins in the gasoline wholesale or retail business, except in accord with federal law as described in the court's opinion.[1] Eight actions, filed by appellees, gasoline refiners and wholesalers, were consolidated for trial. The district court held, *inter alia*, that three orders, issued by DACO pursuant to a Puerto Rico statute, P.R. Laws Ann. tit. 23, § 734, and DACO's Regulation 45, were "preempted by the federal Congressional delegated purpose to let the market forces be the sovereign in this field." 640 F.Supp. at 515.[2] We affirm.

## I. *Background*

In 1942, the Puerto Rico Legislature enacted what is now 23 Puerto Rico Laws Annotated § 734. Section 734 purports to grant authority to regulate prices and profit margins of staple commodities which include gasoline. In 1973, the Puerto Rico legislature vested the authority granted by section 734 in the newly created DACO. P.R. Laws Ann. tit. 3, §§ 341–341v. Pursuant to this authority DACO and its predecessors regulated the price of gasoline and other petroleum products from 1953 to 1973.

Upon the enactment of the Emergency Petroleum Allocation Act (EPAA), 15 U.S.C. §§ 751–760*h* (as amended), DACO suspended its regulatory authority over gasoline prices and profit margins. In 1975, expecting the EPAA to expire on August 31, 1975, DACO issued Price Regulation 45 which would restore its price controls upon expiration of the EPAA. How-

ever, in 1975 Congress enacted the Energy Policy and Conservation Act (EPCA), 42 U.S.C. §§ 6201–6422, which extended federal price control authority to September 30, 1981. *See* 15 U.S.C. § 760g. DACO then amended Price Regulations 45 to provide that the price regulation authority would not become effective until "the Federal Price Controls are lifted over the articles here regulated...." Federal price control authority expired on September 30, 1981.

In 1986, DACO issued a series of orders pursuant to Price Regulation 45 which are the subject of this appeal. The first order, issued March 26, 1986, emphasized a requirement contained in Article 3 of Regulation 45 that DACO be given advance notice of price increases. The second order, issued April 23, 1986, froze gasoline prices at March 31, 1986 levels. The third order, issued May 20, 1986, lifted the freeze on gasoline prices. It divided wholesalers into two groups—minor (Group 1) and major (Group 2). Group 1 wholesalers would be allowed to sell to retailers at a profit of 8.6 cents per gallon, and Group 2 at a profit of 3.6 cents per gallon. DACO issued all of these orders pursuant to Regulation 45, Article 4, which purports to give DACO authority to fix prices and profit margins on the sale of gasoline in Puerto Rico.

In May, 1986, appellees, several oil companies, filed complaints in these actions, seeking declaratory and injunctive relief. The appelles alleged, *inter alia*, that federal law pre-empts DACO's authority to regulate gasoline prices and profit margins. The district court held that DACO's authority is pre-empted by a Congressional decision to leave the determination of gasoline prices to market forces. Specifically, the court found that the provisions of the EPCA which phased out the President's price control authority evidenced a Con-

---

1. The opinion of the district court is reported in 640 F.Supp. 474.

2. The district court ruled that the orders were unconstitutional because they (1) were arbitrary and confiscatory in violation of the Due Process Clause, (2) constituted an unlawful taking without just compensation under the Taking Clause,

and (3) were preempted by federal law under the Supremacy Clause. Appeal of the first two issues was taken to the United States Court of Appeals for the First Circuit, which has denied appellants' motion for a stay of the district court's injunction.

gressional intent to preclude any government regulation of gasoline prices. Consequently, the court held that Regulation 45 and the orders issued pursuant thereto were unconstitutional. The court issued an injunction enjoining DACO from "further implementing or enforcing orders fixing prices or margins of profit in the gasoline wholesale and retail business other than in accord with federal law as described in [its] opinion." The sole issue for this court's consideration is whether the EPAA as amended by the EPCA pre-empts DACO's authority to regulate gasoline prices and profit margins.

## II. *Jurisdiction*

■ In a supplemental brief appellants contend that this court does not have jurisdiction over the entire pre-emption holding. We disagree.

The jurisdiction of this court over EPAA issues is governed by section 5(a) of the EPAA. Section 5(a)(1) incorporates section 211(b)(2) of the Economic Stabilization Act Amendments of 1971 (ESA), Pub.L. 92–210, 85 Stat. 743 (1971).[3] Section 211(b)(2) gives this court "exclusive jurisdiction of all appeals from the district courts of the United States in cases and controversies arising under [the ESA] or under regulations or orders issued thereunder."[4] The courts have interpreted the incorporation of section 211(b)(2) of the ESA in section 5(a)(1) of the EPAA to mean that this court has exclusive appellate jurisdiction of all claims arising under either the ESA or the EPAA.

See *Atlantic Richfield Co. v. Department of Energy*, 769 F.2d 771 (D.C. Cir.1984); *Mobil Oil Corp. v. Tully*, 639 F.2d 912 (2d Cir.1981); *Coastal States Marketing, Inc. v. New England Petroleum Corp.*, 604 F.2d 179 (2d Cir.1979). An issue arising under either of these two acts is one which involves the construction, applicability or effect of the acts or the regulations promulgated under the acts. *Atlantic Richfield Corp. v. Department of Energy*, 769 F.2d at 778–79; *Mobil Oil Corp. v. Tully*, 639 F.2d at 915–16. Here the district court concluded that DACO's price controls are pre-empted by the EPAA. Review of the district court's determination necessarily involves the construction, applicability and effect of the EPAA. We, therefore, have exclusive jurisdiction to review the district court's determination of the pre-emption issue. In deciding this issue our task is to determine Congressional intent in enacting the various provisions of the EPAA. To determine this intent we may look not only to the circumstances surrounding the enactment and amendment of the EPAA, but also to other legislative sources which might shed light on Congressional intent with respect to enactment of the EPAA.

## III. *Pre-emptive Issue*

### A. *Congressional Intent*

As noted above, the primary task in deciding a pre-emption issue is to determine Congressional intent. *Wardair Canada, Inc. v. Florida Dep't. of Revenue*, — U.S. ——, ——, 106 S.Ct. 2369, 2370, 91 L.Ed.2d

---

**3.** Section 5(a)(1) provides:

Except as provided in paragraph (2), (A) sections 205 through 207 and sections 209 through 211 of the Economic Stabilization Act of 1970 (as in effect on the date of enactment of this Act) shall apply to the regulation promulgated under section 4(a), to any order under this Act, and to any action taken by the President (or his delegate) under this Act, as if such regulation had been promulgated, such order had been issued, or such action had been taken under the Economic Stabilization Act of 1970; and (B) sections 212 (other than 212(b)) and 213 of such Act shall apply to functions under this Act to the same extent such sections apply to functions under the Economic Stabilization Act of 1970.

Emergency Petroleum Allocation Act of 1973, Pub.L. 93–159, § 5(a)(1), 87 Stat. 627, 633 (1973) (as amended, codified at 15 U.S.C. § 754(a)(1)).

**4.** Section 211(b)(2) provides in relevant part:

Except as otherwise provided in this section, the Temporary Emergency Court of Appeals shall have exclusive jurisdiction of all appeals from the district courts of the United States in cases and controversies arising under this title or under regulations or orders issued thereunder.

Economic Stabilization Act Amendments of 1971, Pub.L. 92–210, § 211(b)(2), 85 Stat. 743, 749 (1971).

1 (1986); *Louisiana Pub. Serv. Comm'n v. FCC*, —— U.S. ——, ——, 106 S.Ct. 1890, 1894, 90 L.Ed.2d 369 (1986). In *Louisiana Public Service Commission v. FCC*, the Supreme Court summarized the circumstances under which pre-emption has been held to occur.

> Pre-emption occurs when Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law, *Jones v. Rath Packing Co.*, 430 U.S. 519 [97 S.Ct. 1305, 51 L.Ed.2d 604] (1977), when there is outright or actual conflict between federal and state law, *e.g., Free v. Bland*, 369 U.S. 663 [82 S.Ct. 1089, 8 L.Ed.2d 180] (1962), where compliance with both federal and state law is in effect physically impossible, *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132 [83 S.Ct. 1210, 10 L.Ed.2d 248] (1963), where there is implicit in federal law a barrier to state regulation, *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 [103 S.Ct. 2890, 77 L.Ed.2d 490] (1983), where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the states to supplement federal law, *Rice v. Sante Fe Elevator Corp.*, 331 U.S. 218 [67 S.Ct. 1146, 91 L.Ed. 1447] (1947), or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress. *Hines v. Davidowitz*, 312 U.S. 52 [61 S.Ct. 399, 85 L.Ed. 581] (1941).

—— U.S. at ——, 106 S.Ct. at 1894.

This case is somewhat unusual in that the claimed pre-emption results from the absence rather than the presence of federal authority. The Supreme Court, however, has held that pre-emption can occur under these circumstances. In the recent case of *Transcontinental Gas Pipe Line Corp. v. State Oil and Gas Board*, 474 U.S. 409, 106 S.Ct. 709, 717, 88 L.Ed.2d 732 (1986) the Court said: "[A] federal decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left *un*regulated and in that event would have as much pre-emptive force as a decision *to* regulate." (quoting from *Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 384, 103 S.Ct. 1905, 1912, 76 L.Ed.2d 1 (1983)) (emphasis in original).

### B. *Price Control Legislation*

In determining the pre-emption effect of the federal decision to deregulate the gasoline market, we start with a brief summary of the history of federal price controls in the petroleum products market. Federal regulatory authority arose out of an effort to control inflation. In 1970, Congress enacted the Economic Stabilization Act of 1970, Pub. L. 91–379 §§ 201–206, 84 Stat. 796, 799–800 (1970). The ESA gave the President temporary authority "to issue such orders and regulations as he may deem appropriate to stabilize prices, rents, wages and salaries at levels not less than those prevailing on May 25, 1970." This broad price control authority was originally scheduled to expire on February 28, 1971. Subsequent amendments, however, extended the expiration date to April 30, 1973.

In 1973, market disruptions caused by the OPEC oil embargo led to the enactment of the Emergency Petroleum Allocation Act of 1973, Pub. L. 83–159, 87 Stat. 627 (1973). Congress found that the continuation of federal price control authority over crude oil, residual fuel oil, and refined petroleum products was necessary to minimize "the adverse impacts of ... shortages [of these products] or dislocations [in their national distribution systems] on the American people and the domestic economy." EPAA, Pub. L. 93–159 § 2(b), 87 Stat. at 628 (codified at 15 U.S.C. § 751(b)). Consequently, the EPAA directed the President to promulgate a regulation which would provide for the mandatory allocation of crude oil, residual fuel oil, and refined petroleum products. To avoid unfair and discriminatory pricing, the EPAA also directed the President to establish a program for determining equitable prices for these products. Pursuant to this authority, extensive price and allocation controls were promulgated. The result was a heavily regulated market. The EPAA contained

an express pre-emption provision which precluded conflicting state and local regulation. *Id.* § 6(b), 87 Stat. at 633 (codified at 15 U.S.C. § 755(b)).[5] Thus, the EPAA clearly pre-empted regulation such as DACO's Price Regulation 45.

Two years after enactment of the EPAA, Congress enacted the Energy Policy and Conservation Act of 1975, Pub.L. 94–163, 89 Stat. 871 (1975). In enacting the EPCA, Congress re-examined the use of mandatory allocation and price control to alleviate the ill effects of supply disruptions and dependency on imported oil. Congress found that changed market conditions no longer warranted the extensive regulatory structure of the EPAA but that sudden decontrol would not be wise. H.R.Conf. Rep. No. 340. 94th Cong. 1st Sess. 54, *reprinted in* 1975 U.S.Code Cong. & Admin.News 1762, 1816. Thus, Congress amended the EPAA to provide for gradual decontrol. *See* EPCA, Pub.L. 94–163 § 461, 89 Stat. at 955 (codified at 15 U.S.C. § 760g).[6] The EPCA achieved gradual decontrol by extending the President's mandatory authority under the EPAA for 40 months after enactment of the EPCA and thereafter allowing the President discretionary authority until September 30, 1981, at which time all authority expired. *Id.*

Pursuant to this policy the President exempted products on an individual basis until January 28, 1981, when President Reagan, through Executive Order No. 12287, 46 Fed.Reg. 9909 (1981), exempted all crude oil, residual fuel oil, and refined pe-

troleum products from allocation and price controls. Congress then allowed federal price control authority to expire as planned on September 30, 1981. Throughout this period of decontrol, state and local regulation continued to be pre-empted. *Mobil Oil Corp. v. Dubno,* 492 F.Supp. 1004, 1014 (D.Conn.1980), *aff'd in part, dismissed in part,* 639 F.2d 919 (2d Cir.1981); *see also Mobil Oil Corp. v. Tully,* 499 F.Supp. 888, 910 (N.D.N.Y.1980), aff'd, 653 F.2d 497 (Temp.Emer.Ct.App.1981), *vacated and remanded,* 455 U.S. 245, 102 S.Ct. 1047, 71 L.Ed.2d 120 (1982).

### C. *Mobil Oil Corp. v. Tully*

DACO places primary reliance on the opinions of this court and the Supreme Court in *Mobil Oil Corp. v. Tully.* DACO argues that the pre-emption issue has already been decided in these two opinions. A review of *Tully,* however, in light of the Supreme Court's recent opinion in *Transcontinental, supra,* reveals that DACO's reliance is misplaced.

In *Mobil Oil Corp. v. Tully,* this court reviewed the district court's determination that an anti-passthrough provision of a New York tax on petroleum products was pre-empted by the EPAA. By the time this court decided *Tully,* President Reagan had lifted all price controls; yet, the EPAA itself had not expired. We affirmed the district court, but noted that federal price control authority would expire a short time later and at that time federal concern in the area and the conflict between the state and

---

**5.** Section 6(b) provides:

The regulation under section 4 and any order issued thereunder shall preempt any provision of any program for the allocation of crude oil, residual fuel oil, or any refined petroleum product established by any State or local government if such provision is in conflict with such regulation or any such order.
EPAA, Pub.L. 93–159 § 6(b), 87 Stat. at 633 (codified at 15 U.S.C. § 755(b)).

**6.** Section 461 provides:

Notwithstanding any other provision of this Act, at midnight on the conclusion of the 40th month in which the amendment under section 8(a) is in effect, the President's authority to promulgate, make effective, and amend a regulation pursuant to section 4(a) of this Act

shall become discretionary rather than mandatory, and the limitations on the President's authority contained in sections 4(b)(2), 8, and 9 of this Act shall terminate. The authority to promulgate and amend any regulation or to issue any order under this Act shall expire at midnight September 30, 1981, but such expiration shall not affect any action or pending proceedings, administrative, civil, or criminal, not finally determined on such date, nor any administrative, civil, or criminal action or proceeding, whether or not pending, based upon any act committed or liability incurred prior to such expiration date.
EPCA, Pub.L. 94–163 § 461, 89 Stat. at 955 (codified at 15 U.S.C. § 760g).

federal regulatory schemes would end. 653 F.2d at 502. The case was then appealed to the Supreme Court.

By the time the Supreme Court issued its decision, all federal price control authority had expired. Thus, the Supreme Court considered the pre-emption issue in a different context than this court. Noting the recent expiration of federal price control authority, the Supreme Court vacated the judgment and remanded the case to this court "for reconsideration in light of the expiration of federal price control authority." *Tully v. Mobil Oil Corp.*, 455 U.S. 245, 246, 102 S.Ct. 1047, 1048, 71 L.Ed.2d 120 (1982) (per curiam). The court stated: "The expiration date for the statute has come and gone; the only barrier to the enforcement of the antipassthrough provision no longer exists." *Id.* at 247, 102 S.Ct. at 1049. The Court held that only "secondary issues" remained to be decided.[7] It left those secondary decisions for this court to decide. Justice Stevens, dissenting, concluded that the only issue properly before the Court was the pre-emptive effect of the EPAA prior to expiration, and that this court's opinion and the issues as framed by the parties addressed only the pre-emptive effect of the EPAA. *Id.* at 249–50, 102 S.Ct. at 1050 (Stevens, J., dissenting). Consequently, Justice Stevens stated, "Since the subsequent expiration of federal authority has no bearing on that question, I simply would affirm its [the TECA's] judgment." *Id.* at 251, 102 S.Ct. at 1051. Although *Tully* appears to answer the question we now face, the context of its appeal to the Supreme Court and the Supreme Court's recent decision in *Transcontinental* convince us that *Tully* is not an appropriate guide for our decision.

D. *Transcontinental Gas Pipe Line Corp. v. State Oil and Gas Board*

In *Transcontinental*, the Court considered the pre-emptive effect of Congress' decision to deregulate the natural gas mar-

ket. Pursuant to its ratable-take rule, Mississippi's State Oil and Gas Board issued an order requiring a pipeline company to purchase "high cost" natural gas in ratable portions from all interest holders in a common reserve regardless of existing contracts. Prior to the Oil and Gas Board's order, the Natural Gas Policy Act of 1978 (NGPA), removed the Federal Energy Regulatory Commission's (FERC) regulatory authority over first sales of high cost natural gas. *See* 15 U.S.C. § 3331(b). Before enactment of the NGPA the FERC had such authority under the Natural Gas Act of 1938. The Court framed the issue before it as follows:

> The proper question in this case is not whether FERC has affirmative regulatory power over wellhead sales of § 107 [high cost] gas, but whether Congress, in revising a comprehensive federal regulatory scheme to give market forces a more significant role in determining the supply, the demand, and the price of natural gas, intended to give the states the power it had denied FERC.

*Transcontinental*, 106 S.Ct. at 717. The Supreme Court held that the removal of FERC's authority over first sales of high cost gas was part of a federal scheme to rely on market forces to determine the supply and price of natural gas. *Id.* at 716–17. Consequently, Congress' decision to rely on market forces pre-empted state and local regulation which interfered with those market forces. *Id.* at 717–18.

As in *Transcontinental*, we must determine whether by removing federal price control authority Congress intended to allow the states to step in and assume price control authority over gasoline. Our review of the legislative history of the EPCA convinces us that it did not.

E. *Legislative History of EPCA*

Under the EPAA and its amendments federal concern and regulatory authority in

---

7. The secondary issues mentioned by the Court were the oil companies' ability to pass through taxes paid before expiration of federal price control authority and the validity of the "self-

destruct" provisions of the New York Statute. *Tully v. Mobil Oil Corp.*, 455 U.S. at 248, 102 S.Ct. at 1049.

the crude oil, residual fuel oil, and refined petroleum products markets was pervasive. The federal regulatory scheme left little or no room for state and local regulation in the area. In enacting the EPCA, Congress found that due to changed conditions the federal regulatory structure no longer served the goals of the EPAA. The Senate Conference Report on the EPCA stated:

> [A] comprehensive regulatory structure of the scope outlined above may no longer be necessary. On the other hand, to allow such a comprehensive structure to expire, overnight, may itself create severe dislocations. To the extent that mandatory controls are no longer needed or desirable, a gradual return to an unregulated market is preferable to sudden decontrol.

S.Conf.Rep. No. 516, 95th Cong., 1st Sess. 203, *reprinted in* 1975 U.S.Code Cong. & Admin News 1956, 2045. Thus, Congress extended the EPAA and provided for conversion to standby regulatory authority. "Extension of the EPAA and its conversion to standby authority offer[ed] ... the potential for a smooth transition of petroleum markets from a closely regulated state to a large[ly] unregulated status subject to standby pricing and allocation authority." *Id.* at 204, *reprinted in* 1975 U.S.Code Cong. & Admin.News at 2045. It is clear that Congress felt that the best mechanism to combat supply disruptions and the country's reliance on imported oil was to allow market forces to operate freely. The EPCA's gradual decontrol evidences a carefully controlled transition to an unregulated market. Throughout the transition the federal scheme continued to pre-empt state regulation in the area, even with respect to exempted products. *Mobil Oil Corp. v. Tully*, 653 F.2d at 502; *Mobil Oil Corp. v. Dubno*, 492 F.Supp. at 1014; *see also Tully v. Mobil Oil Corp.*, 455 U.S. at 250–51, 102 S.Ct. at 1050–51 (Stevens, J., dissenting). It is inconceivable that Congress would implement such an extensive and carefully orchestrated termination of federal intervention with the intention that the states step in to regulate the same subject matter as soon as all federal intervention ceased.

A single state's regulation of petroleum products may not have a substantial effect on national markets. However, the possibility of over 50 individual regulatory schemes operating in the petroleum products markets clearly conflicts with and frustrates Congress' goal of allowing market forces to regulate the supply and price of petroleum products.

Since the enactment of the ESA, the petroleum products markets have been subject to federal regulation. The OPEC oil embargo and consequent supply disruptions demonstrated the need for policy decisions at the national level. The enactment of the EPCA evidences Congressional recognition of the continuing necessity for a strong national policy on energy. Nothing in the legislative history of the EPCA convinces us that Congress' decision to remove federal controls should be interpreted "as an invitation to the States to impose additional regulations." *Transcontinental*, 106 S.Ct. at 717. On the contrary, the legislative history convinces us that Congress intended to establish a market free of *any* government control other than standby emergency controls.

## F. *Post-expiration Actions*

Finally, DACO argues that legislative and executive actions taken after the expiration of federal price control authority demonstrate that neither Congress nor the President considered the expiration of federal authority to pre-empt state and local authority. DACO relies on the history of post-expiration attempts to structure a national plan for addressing energy emergencies. Specifically, DACO points to the President's veto of the Standby Petrolum Allocation Act of 1982 (SPAA), Congress' failure to override that veto, and the subsequent enactment of the Energy Emergency Preparedness Act of 1982 (EEPA). As we noted above, the jurisdictional constraints of this court allow us to look to these post-expiration actions only for the purpose of determining the intent of Congress in phasing out federal authority under the

EPAA. We cannot look to these actions as a basis for pre-emption.

Our review of these post-expiration actions strengthens our conclusion that Congress intended to rely on market forces to determine the allocation and prices of petroleum products. The inclusion of an express pre-emption provision in the SPAA, S. 1503 § 280(a), 97th Cong., 2d Sess., 128 Cong.Rec. H411 (daily ed. Feb. 22, 1982), might indicate that Congress did not believe that pre-emption survived the expiration of federal authority under the EPAA. However, it could also indicate that Congress was unsure about post-expiration pre-emption as a result of ongoing litigation in *Mobil Oil Corp. v. Tully* and wanted to reaffirm its position that allocations and price controls are a matter of federal concern.[8]

What is clear is that both supporters and opponents of the SPAA placed great reliance on market forces as the best means of avoiding supply disruptions. The regulatory authority granted by the SPAA was intended to be employed only in cases of "severe petroleum supply shortage". S. 1503 § 275(a)(1), 97th Cong., 2d Sess. ——, *reprinted in* 128 Cong.Rec. H410 (daily ed. Feb. 22, 1982). Otherwise, market forces would determine the allocation and prices of petroleum products. The fact that the Senate sustained President Reagan's veto is further evidence of a strong national policy to rely on market forces, even in the case of an emergency. The legislative history of the SPAA does not persuade us that Congress did not intend the expiration of federal authority to pre-empt state authority. Rather, it strengthens our conclusion that Congress intended to rely almost exclusively on market forces to determine prices and allocate supplies of petroleum products and to avoid governmental interference with market mechanisms.

The EEPA was enacted in 1982 in response to fears that "a shortage of petroleum products caused by reductions in imports of petroleum products may occur at any time [and that] such a shortage may be sufficiently large to cause severe economic dislocations and hardships, or constitute a serious threat to health, safety, and welfare." S.Rep. No. 393, 97th Cong., 2d Sess. 19, *reprinted in* 1982 U.S. Code Cong. & Admin.News 600, 615. Under the EEPA, the President was to advise Congress on what powers he had under other laws to deal with such emergencies. 42 U.S.C. §§ 6281, 6282. Congress found that "in the event of such a shortage, reliance on free market allocation and pricing of available petroleum product supplies may not be adequate to mitigate the adverse impacts of the shortage." S.Rep. No. 393 at 19, *reprinted in* 1982 U.S. Code Cong. & Admin.News at 615. Congress did not by enactment of the EEPA alter the free market policy it had expressed in the EPCA. Rather, it reiterated that policy.

It is clear that the EEPA's disclaimer, 42 U.S.C. § 6282(c)(2), was intended to address only state and local *emergency* regulations and programs. In explaining the preemption disclaimer Congress stated that its sole purpose was to reassure the states that the "authorities of the states to enact laws in anticipation of, or in response to, energy emergencies remain unaffected by this legislation." H.R.Conf.Rep. No. 663, 97th Cong., 2d Sess. 11, *reprinted in* 1982 U.S.

---

**8.** With regard to the pre-emption provision, the House Conference Report stated:

> In general, it is the intent of the conferees that the decision as to when and to what extent to replace market mechanisms with mandatory price and allocation program[s] in the petroleum industry is a Federal decision, and State laws that would usurp this Federal role are hereby preempted.

H.R.Conf.Rep. No. 432, 97th Cong., 2d Sess. ——, *reprinted in* 128 Cong.Rec. H409, H415 (daily ed. Feb. 22, 1982). The House Conference Report also expressly disclaimed any intent "to interfere with the ongoing litigation with respect to State laws, [i.e. *Mobil Oil Corp. v. Tully*]. *Id.* at ——, 128 Cong.Rec. at H415. In the debate over whether to sustain President Reagan's veto of the SPAA, Senators Jackson and McClure recognized a need for a strong pre-emption provision. 128 Cong.Rec. S2729, S2743–44 (daily ed. Mar. 24, 1982). Absent the dicta in *Mobil Oil Corp. v. Tully,* it is doubtful that the members of Congress would have seen such a compelling need for a pre-emption provision.

Code Cong. & Admin.News 634, 637. The disclaimer does not evidence a Congressional belief that pre-emption of nonemergency state and local price control authority did not survive the expiration of federal authority. The legislative history of the EEPA demonstrates Congress' continuing efforts to retain an unregulated market and is additional evidence of its previous intent to establish a market free of any government interference.

Nothing in the post-expiration legislative and executive actions persuades us that Congress intended to allow the states to step in and regulate the petroleum products markets after the expiration of federal authority. It is clear that the success or failure of post-EPAA legislation was almost entirely dependent on the resulting degree of interference with a free market. Thus, on this issue of national importance, Congress's initial intent to deregulate the petroleum products market remained in place. The post-expiration actions reinforce our conclusion that by phasing out federal authority to regulate the petroleum products markets Congress intended to establish markets free of any government interference.

### IV. *Conclusion*

█ We hold that the district court correctly concluded that "Regulation No. 45, Amendment 1, Article 4, and the temporary orders of March 26, April 23, and May 20, 1986, are preempted by the federal Congressional delegated purpose to let the market forces be the sovereign in [fixing prices or profit margins of petroleum products]." As in *Transcontinental,* the federal decision to forgo regulation implies "an authoritative federal determination that the area is best left *un* regulated", and Congress did not intend to give the states the power it has denied the federal government. DACO's price controls interfere with and obstruct Congress' goal of letting market forces set prices and allocate petroleum products. Nothing in the post-EPAA legislative or executive actions detracts from Congress' initial intent to establish markets free of any government interfer-

ence. The district court properly recognized that only in shortages creating "energy emergencies" do states have the power to regulate petroleum product allocation and prices to ensure health, safety and welfare.

The judgment of the district court is affirmed.

CHRISTENSEN, dissenting.

The majority opinion well states the case and defines the basic issue on the appeal. I fully agree that this Court has jurisdiction to decide the issue for the reasons there stated.

But I can find no real basis either in the text and context of the federal legislation involved, or in developments following its expiration, for holding that by discontinuing federal oil controls Congress intended to continue them in effect indefinitely in curtailment of the ordinary police powers of the states and commonwealth.

There is in my judgment no warrant for us to disregard decisions of this Court and the Supreme Court to the contrary in a case admittedly in point, on the theory that they have been superseded by a later decision which I believe to be clearly distinguishable.

And to affirm in this situation the establishment by the district court's flawed declaratory judgment of a system of state constraints of uncertain extent without the benefit of congressional processing, definition and approval, appears to me not only improvident, but beyond the judicial as distinguished from the legislative function.

No one has suggested, nor could it reasonably be thought, that immediately before adoption of the Economic Stabilization Act of 1971 (ESA) and the Emergency Petroleum Allocation Act of 1973 (EPAA) state regulations affecting the oil industry had been preempted by Congress. It also must be clear that post-expiration legislation actually passed by Congress concerning possible future emergencies, standing alone, had no such effect. The most that can be said about the latter developments

is that related comments of individual members throws light upon whether in enacting and amending the EPAA and then permitting it to expire in restoration of a market free from the comprehensive federal controls theretofore existing, Congress intended also that the market be free from all non-federal controls.

Federal controls, as our decisions demonstrate time and time again, were of emergency origin and sustained and interpreted in light of the emergency. *See,* e.g., *Condor Operating Co. v. Sawhill,* 514 F.2d 351 (TECA), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1975, 44 L.Ed.2d 467 (1975). The very names of the Act and of this Court underscore their transitory nature and purpose. Nowhere in their terms or history was there a suggestion that they were occasioned by, or designed to deal with, problems of state laws, or that there were any such problems except perhaps in the sense that they had proved incapable of coping with emergent shortages.

The congressional findings explaining the basis of the EPAA pointed out that shortages of crude oil, residual fuel oil and refined petroleum products had caused, or were likely to cause, severe economic dislocation and hardship. Congress, accordingly, determined that the best method of averting or minimizing the national threat was to grant the President specific "temporary authority" to deal with the shortages and dislocations. It is paradoxical that expiration of such temporary emergency measures, designed and administered for another purpose, should have the effect of permanently constraining the ordinary exercise of the police powers of state governments which presented no problem within the recognition of Congress except in emergency context and which had nothing to do with the adoption of the Act.

The prevailing opinion cites subsequent congressional support for a "free market," but expressions along this line were focused on freedom from the pervasive federal controls theretofore existing. It is true that some individual members specifically advocated preemption of state regulations while others took the view that there was and should be no such preemption. But we are concerned not with individual beliefs or desires, but an institutional intent to preempt, which is not proved by the failure of legislation which would have established it, nor by the subsequent enactment of legislation negating it. The record of institutional intent indicates no more.

The Standby Petroleum Allocation Act of 1982 (SPAA) as passed by Congress contained a plain preemption provision. However, Congress failed to override a presidential veto and the act never became law. Thereafter, Congress passed and the President signed the Energy Emergency Preparedness Act (EEPA). 42 U.S.C. §§ 6281–82. Included was this provision:

> No State law or State program in effect on the date of enactment of this part, or which may become effective hereafter, shall be construed to be superseded by any provision of this part.

42 U.S.C. § 6282(c)(2). In a memorandum submitted to Congress, the Attorney General concluded that there was no federal law that preempted state regulation of petroleum prices or allocation. Attorney General's Memorandum of Law 70–74 (Nov. 24, 1982).

Senator James McClure, Chairman of the Senate Energy Committee, introduced legislation in the 98th Congress to expand the President's powers to deal with an energy emergency. This bill contained an express preemption provision like that of the vetoed SPAA, except that it also would have given the President affirmative authority to exempt from preemption certain state laws and regulations he found not to be in conflict with the federal authority. The administration responded:

> We think this reverses the presumption that ought to apply to State and local laws, and represents an unwarranted departure from principles of Federalism.[1]

This bill died in committee.

I do not find the post-expiration circumstances persuasive of preemption, and

---

1. Energy Emergency Preparedness Act Amendments of 1983; and the International Energy

would adhere to the view this Court and the Supreme Court expressed in *Mobil Oil Corp. v. Tully,* 653 F.2d 497 (TECA 1981), *vacated and remanded,* 455 U.S. 245, 102 S.Ct. 1047, 71 L.Ed.2d 120 (1982). *See also Mobil Oil Corp. v. Tully,* 499 F.Supp. 888 (N.D.N.Y.1980), *aff'd,* 653 F.2d 497, *supra.*

In *Tully,* the district court held that because a state antipassthrough rule effectively regulated oil prices, the state statute had been preempted by the EPAA, and issued an injunction permanently enjoining enforcement of that rule. 499 F.Supp. 888. On appeal this Court affirmed, 653 F.2d 497, concluding:

> Any attempt by New York State to affect the structure of prices charged by the oil companies pursuant to federal regulation is barred by conflict with the federal scheme. The EPCA expires by its terms on September 30, 1981. 15 U.S.C. § 760g. In the meantime, the goals to control the impact of OPEC determinations regarding production and prices are viable. At the present time price decontrol has been determined by the President to be the best method to achieve an enunciated goal. The state statute under attack here is an instrument of price control and in conflict with the objectives of the program. *See Ray v. Atlantic Richfield,* 435 U.S. 151, 178, 98 S.Ct. 988, 1004, 55 L.Ed.2d 179 (1978). When the statute expires in September 1981, it will signal the end of federal concern in this area. Until that time the state statute is in conflict with the federal statute and regulations.

653 F.2d at 502.

A petition for certiorari was filed with the Supreme Court. On October 13, 1981, two weeks after expiration of regulatory authority under the EPAA, the Supreme Court asked the parties for their views on whether expiration of the statute mooted the case. The parties responded that there were some pre-expiration questions that survived, such as the extent of the oil com-

panies' tax liability, and therefore the case was not entirely moot. On February 22, 1981, the Supreme Court *per curiam* vacated and remanded the case for reconsideration in light of the expiration of federal price authority under the EPAA. It stated:

> [TECA] affirmed the district court's decision, but noted that the federal statute would expire by its own terms in September 1981, and that expiration of the Act "will signal the end of federal concern in this area." . . .
> New York State tax officials then appealed TECA's decision to this Court. We now vacate the judgment and remand the case to TECA for reconsideration in light of the expiration of federal price control authority.
> The normal rule in a civil case is that we judge it in accordance with the law as it exists at the time of our decision. . . . The expiration date for the federal statute has come and gone; the only barrier to the enforcement of the antipassthrough provision no longer exists. However, the injunction entered by the district court and affirmed by TECA did not terminate on October 1, 1981, the date that TECA acknowledged to signal the end of federal concern in the area. Thus, in its present form the declaration of the invalidity of the antipassthrough provision and the accompanying injunction against enforcing it have no current validity and must be set aside.

455 U.S. at 246–47, 102 S.Ct. at 1048–49. (Citations and footnote omitted).

In a footnote the very point controlling here was emphasized by the Supreme Court:

> To be sure, the expiration provision contained in the EPAA states that "such expiration shall not affect any action or pending proceedings, administrative, civil, or criminal, not finally determined on such date, nor any administrative, civil, or criminal action or proceeding, whether or not pending, based upon any act com-

Agency Program: Hearing before the Senate Committee on Energy and Natural Resources,

98th Cong., 1st Sess. 612 (Oct. 19, 1983).

mitted or liability incurred prior to such expiration date. 15 U.S.C. § 760g.

Whatever bearing this saving clause may have upon other aspects of the case, it surely cannot mean that, despite the expiration of the preempting federal law, New York should be permanently enjoined from enforcing its antipassthrough provision.

455 U.S. at 247 n. 2, 102 S.Ct. at 1049 n. 2.

In support of a contrary view, reliance is placed in the prevailing opinion upon statements from the dissent of Justice Stevens in *Tully* and upon the later 5–4 decision in *Transcontinental Gas Pipe Line Corp. v. State Oil and Gas Board*, 474 U.S. 409, 106 S.Ct. 709, 88 L.Ed.2d 732 (1986). There the issue was the validity of a Mississippi "ratable-take" order requiring an interstate natural gas pipeline to purchase gas proportionally from all the owners of a common gas pool. Prior to 1978, federal jurisdiction over wellhead sales of the natural gas in question had been both plenary and preemptive. In the Natural Gas Policy Act of 1978, however, Congress terminated the authority of the Federal Energy Regulatory Commission to regulate such sales. The state argued that Congress' withdrawal of federal authority cleared the way for the state, in the exercise of its historical police powers, to impose its ratable-take without conflicting with any remaining federal regulatory jurisdiction. The Court concluded that "[i]n light of Congress' intent to move toward a less-regulated national natural gas market, its decision to remove jurisdiction from FERC cannot be interpreted as an invitation to the states to impose additional regulations." 106 S.Ct. at 717.

The majority sees support for their position in the phrasing of its statement of the question, which they quote:

> The proper question in this case is not whether FERC has affirmative regulatory power over wellhead sales of § 107 (high cost) gas, but whether Congress, in revising a comprehensive federal regulatory scheme to give market forces a more significant role in determining the supply, the demand, and the price of natural gas, intended to give the states the power it had denied FERC.

I see in this question quite the opposite, specifying as it does the revision of a comprehensive regulatory scheme rather than its termination, which distinction is the same as the one we and it had already drawn in *Tully* in sustaining the injunction while controls under the EPAA were being phased out, and the expiration of all controls which would "signal the end of federal concern in this area." The Supreme Court's answer to the quoted question makes this determinative distinction even clearer:

> The answer to the latter question must be in the negative. First, when Congress meant to vest additional regulatory authority in the states it did so explicitly. *See* §§ 503(c) and 602(a), 15 U.S.C. §§ 3413(c) and 3432(a). Second, although FERC may now possess less regulatory jurisdiction over the "intricate relationship between the purchasers' cost structures and eventual costs to wholesale customers who sell to consumers in other states," *Northern Natural,* [*Gas Co. v. State Coporation Comm'n of Kansas*], 372 U.S. [84] at 92 [83 S.Ct. 646, 651, 9 L.Ed.2d 601], than it did under the old regime, that relationship is still a subject of deep federal concern. FERC still must review Transco's pricing practices, even though its review of Transco's purchasing behavior has been circumscribed ... In light of Congress' intent to move toward a less-regulated national natural gas market, its decision to remove jurisdiction from FERC cannot be interpreted as an invitation to the states to impose additional regulations.

106 S.Ct. at 717.

The majority sees the possibility of over 50 individual regulatory schemes frustrating Congress's goal of allowing market forces to regulate the supply and price of petroleum products. I apprehend no such problem. Puerto Rico, because of its isolation, and the essentially local nature of its oil business, presents a peculiar situa-

tion. The district court found that no state had adopted similar regulations. There are already constitutional limitations on the exercise of their police power, including the Commerce and Due Process clauses, and Congress, of course, has the power to deal with any concern of this nature in light of the Supremacy Clause. Whether this need be done, and if so, when and how, are legislative questions which Congress has not seen fit to act upon.

On the other hand, the problems that will be created by judicially declared preemption in the context of the expired EPAA are far-reaching and intractable, as the courts try to solve them without congressional guidance but in view of the declaratory judgment of the district court herein affirmed.[2]

Since, as we have held, this Court has appellate jurisdiction following the supposed expiration of the EPAA over the present issue of state law preemption, it necessarily will continue to have such juris-

diction of all future appeals involving the extent of that preemption in other cases long after adjudications of the validity and effect of the regulations and programs under ESA and the EPAA have been fully completed.

This, also, will be a consequence I think Congress did not intend, as I believe it did not intend from the expiration of those federal controls to constrain ordinary exercise of state police power under the criteria laid down by the district court's declaratory judgment, or at all, in the context of the EPAA.

For the foregoing reasons I feel constrained to dissent.

---

2. While the judgment itself is relatively brief, it permits the implementation of the mentioned local laws only "in accord with federal law as described in this opinion and order" and "as long as the implementation is consistent with our findings and conclusions." (These consist of 38 pages of printed material). 640 F.Supp. 474, 515.